**Opinion issued February 4, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00997-CR

———————————

**JOHN ANTHONY LOPEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 184th District Court
Harris County, Texas
Trial Court Case No. 1282701

**O P I N I O N**

Appellant John Anthony Lopez appeals his conviction for murder entered after a plea of guilty. *See* TEX. PENAL CODE ANN. § 19.02 (West 2011). He argues that the trial court should have granted him a new trial because he received ineffective assistance of counsel in deciding to plead guilty and in presenting his case at the sentencing hearing. We affirm.

**Background**

On the afternoon of October 22, 2010, Lopez visited a Wing Stop with his five-year-old daughter. He got in line to order his food, standing behind the complainant, Travone Ford, and Ford's brother-in-law, Landon Johnson. Once Lopez reached the front of the queue, he began to speak with the cashier but was interrupted by Ford, who returned to add a drink to his order. Lopez asked Ford to wait until he was finished. According to Lopez's testimony, the admonition perturbed Ford: he threatened Lopez with violence, indicating his membership in the Bloods street gang.

After this initial verbal altercation, Lopez returned with his daughter to his car, which was parked at the curb directly in front of the restaurant. While his daughter stepped into the vehicle, Lopez opened his trunk. He testified that he could see Johnson and Ford through the glass windows of the restaurant, and he heard Johnson instigating Ford to pursue and fight him.

Claiming that he feared an imminent attack, Lopez explained that he approached the two men in an effort to deescalate the situation. Unfortunately for Lopez, they met him at the door and backed him up the short distance to the trunk of his car. Johnson slammed Lopez into the trunk of the car, commencing a beating in which Ford and Johnson issued a barrage of punches and kicks. When Lopez was knocked to the ground, Ford began kicking his prone body. After Lopez was struck to the concrete a second time, the pummeling ended.

The three men lingered around Lopez's car for a minute or two thereafter, Lopez taking his time to leave after Johnson returned his keys. Lopez testified that the two men threatened his life, telling him he was lucky he had not been shot and that he should hope not to be accompanied by his daughter at their next meeting.

The surveillance video from the restaurant shows that Lopez backed out of the space in which he was parked. Seconds later, a different camera shows Lopez parking at another space at the parking lot's edge. He left his car and opened the trunk. Less than a minute later, Ford also reversed his car from its parking space. Lopez testified that he regarded this act as a prelude to further violence. He removed a shotgun from the trunk. Lopez fired at Ford's car, claiming he intended only to "deflect" Ford by hitting his bumper. Ford sped away in the opposite direction, mortally wounded from shotgun pellets that had penetrated the trunk and

3

both rows of seats. Lopez left the scene but discovered later that the incident had made the local television news. He turned himself in to the police.

Lopez was indicted for murder. Acting on advice from his attorney, Don Hecker, he pleaded guilty to murder without a sentencing recommendation from the prosecutor.[1] After a presentence investigation hearing, the trial judge sentenced him to eighteen years in prison. He retained new counsel, attorney Brittany Carroll, who filed a motion for new trial. The motion was granted as to punishment only, and a new punishment hearing was held. Among other things, Carroll extensively argued that "this is a clear case of sudden passion arising from an adequate cause." 4 RR 29-32. Based on these arguments, Carroll advocated that the trial court "make a finding of sudden passion reducing this down to second degree" and accordingly impose a sentence of "between 2 and 20 years." 4 RR 32. The judge entered a second judgment of conviction of first-degree-felony murder, reducing the sentence to fifteen years in prison. Lopez responded with a second motion for

---

[1] The dissent contends that Lopez specifically pleaded guilty to "first-degree murder." Dissent at 28. However, although he was admonished that if convicted he would face the range of punishment applicable to a first-degree felony, Lopez did not specifically plead guilty to first-degree murder. He confessed to the elements of murder, without any agreed recommendation concerning punishment. Despite appellant's argument and the dissent's contention otherwise, nothing relating to the guilty plea "foreclosed the possibility that Lopez could present evidence that he acted with sudden passion," *id.*, in order to seek a reduction to second-degree murder. *See* TEX. PENAL CODE § 19.02(d) (West 2011). Indeed, as noted above, his counsel did precisely that.

4

new trial in which he claimed that he received ineffective assistance of counsel from Hecker with respect to his decision to plead guilty and at his first punishment hearing.

Lopez's second motion for new trial was accompanied by his own unsworn statement and multiple affidavits from his friends and family members. In pertinent part, these declarations asserted that attorney Hecker had assured Lopez and his family that Lopez would receive probation, not jail time, or that charges would be dismissed. The statements also claimed that Hecker had not performed an independent investigation in the case, that he had not inquired about the criminal history of the complainant and his companion and that he had not spoken with friends and family who could have testified on Lopez's behalf at his initial punishment hearing. Lopez also asserted that Hecker "never discussed self-defense, or the state's requirement to prove 'intent' as an element of Murder" with him.

In opposition to Lopez's second motion for new trial, the State presented three affidavits from Hecker. His first affidavit reads, in its entirety:

> My name is Don A. Hecker. I am a licensed practicing attorney in the State of Texas and competent to make this affidavit. I represented the above-captioned Defendant in his case.
>
> I approached the Court and asked Judge Krocker whether or not she would be able to consider adult probation in the case of *State of Texas v. John Lopez* prior to his plea. I did this because it has been my practice to enquire, prior to requesting a pre-sentence investigation

and having my client enter a plea of guilty, whether or not the Court will even consider a deferred adjudication with a full explanation of what the facts should show and the District Attorney's version of the facts. If the Court tells me there is no possibility given those facts, then I report that to my client.

In this case, the Court remembered my proffer when I did a request for bond reduction and my urging the Court that this case was at worst a case of sudden passion.

The Court having told me that she would consider deferred probation I reported to my client that if he entered a plea of guilty the Judge could sentence him to 5 or 99 years or life or 5 to 10 years deferred adjudication probation.

I told him, as the Court did at the time of the plea, that there was absolutely no way anyone could predict which of these alternatives the Judge would select in this case. The primary reason that the client did not want to have a jury trial in this case was that if a jury gave him adult probation it would be a conviction and his only chance to avoid a conviction was a not guilty from a jury trial or deferred adjudication probation from the Court. He selected the plea to the Court after I thoroughly went over the facts of this case, which included a scene video of the fight between the Defendant and the deceased Complainant and the shooting by the Defendant after he moved his vehicle and the deceased Complainant had also driven off. The basis for his defense that he was acting in self-defense, having been beaten by the deceased Complainant and a friend, could have failed due to the time lapse between the fight and the possible removal of the threat being posed by the Complainant at the time the Defendant elected to fire the weapon.

I thoroughly explained to Mr. Lopez on several occasions that the range of punishment was 5 to 99 years or life as well as a possible $10,000 fine. I also explained to him that if in fact the jury convicted him of the lesser-included offense of manslaughter and they gave him probation for 2-10 years or penitentiary time for 2-20 years there would still be a final felony conviction. Again, he elected to plead guilty as it was the only possibility under the facts in this case to avoid going to prison as well as avoid a felony conviction. I have handled

6

many cases involving similar fact situations. There is no question in my mind that he thoroughly understood every option available to him prior to his plea of guilty.

Hecker's amended affidavit added the following information:

All of the state's evidence had been given to me well ahead of the date the plea on this case. I traveled to the scene of the event and gave a complete description to Mr. Lopez in regard to his claim that this case involved self-defense, the protection of his child, and himself. There were several District Attorneys handling the case over a period of time. The request for bond reduction included the analysis of the case from the investigation I had done, which resulted in the lowering of his bond. Much of the investigation was done early on in the case.

Mr. Lopez wanted to plead guilty and request a pre-sentence investigation because it was his only chance to avoid a felony conviction after hearing the total explanation of all factors in the case.

The list of affidavits submitted on behalf of Mr. Lopez was provided by Mr. Lopez and the Defendant was told to have all of the witnesses appear for the hearing. Counsel had no indication of any other witnesses that he would have.

It is important to note that there is a video of this occurrence. The witness that we called in regard to the facts of the case had talked to me about what he saw at the scene. He remembered seeing John beaten up and I used him to reemphasize that fact that John was a victim of assault prior to the shooting. A picture of John's injuries was part of the evidence in this case. The Court had the power to grant his deferred adjudication in this case. I never ask a witness to lie. I was happy with the description given by the witness, which totally corroborated what the tape showed.

The end result of this case is in line with cases involving murder as a result of sudden passion. Many have come out much worse. I did not believe that the information concerning past criminal history of the two co-actors was as important as the immediate threat to Mr. Lopez's safety by the Complainant when he asserted that he was a gang member, and subsequently asserted that he would kill Mr. Lopez. The

fact that he had been in trouble before did not present the kind of evidence needed to put Mr. Lopez in fear of imminent bodily injury or death at the time of the shooting.

The Complainant did not have a history of final felony convictions that would have made a difference in this type of situation.

In his final affidavit, Hecker stated:

Counsel, Brittany A. Carroll, has furnished me a copy of a deferred adjudication plea that indicates that I represented Landon Johnson, a witness in the above-captioned case in . . . 1998 in Fort Bend County, Texas. I apparently did so, however, I do not remember it nor do I know if it is the same Landon Johnson who is a witness. I never told John Lopez that I represented a Landon Johnson during my representation of him.

Ultimately, the trial court denied the second motion for a new trial. Lopez now appeals from the judgment.

**Analysis**

Lopez contends that he received ineffective assistance of counsel in deciding to plead guilty. He contends that Hecker incorrectly informed him that he would be eligible for probation if he pleaded guilty to murder. He further argues that Hecker conducted an inadequate investigation of the facts before advising a guilty plea. In either case, he claims that multiple plausible defensive theories were available to him had he put his case before a jury. Lopez makes no claim that he received ineffective assistance of counsel at his second punishment hearing.

So that the Sixth Amendment's right to counsel in criminal proceedings does not become a hollow guarantee, the courts require that a criminal defendant not

8

merely have an attorney appointed but that the lawyer give reasonably effective assistance. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986). *Strickland* mandates that claims of ineffective assistance be evaluated with a two-part test: (1) whether the attorney's performance was deficient, i.e., did counsel make errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment; and if so, (2) whether that deficient performance prejudiced the party's defense. 466 U.S. at 687, 104 S. Ct. at 2064.

The adequacy of attorney performance is judged against what is reasonable considering prevailing professional norms. *Id.* at 688, 104 S. Ct. at 2065. Because "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," our review is "highly deferential." *Id.* at 689, 104 S. Ct. at 2065. To implement that deference, there is a presumption that, considering the circumstances, a lawyer's choices were reasonably professional and motivated by sound trial strategy. *Id.* In the face of this presumption, a criminal defendant has the burden of showing by a preponderance of the evidence that his attorney failed to provide reasonably effective assistance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

9

An error prejudicial to a criminal defendant is one that had an effect on the judgment. *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. A defendant need not establish such an effect by a preponderance of the evidence but need only show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* As the Supreme Court explained, "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

The Court of Criminal Appeals has applied these standards in the context of guilty pleas. *See Ex parte Moody*, 991 S.W.2d 856, 857–58 (Tex. Crim. App. 1999). A guilty plea entered after a proper demonstration of ineffective assistance of counsel is considered involuntary and therefore invalid. *See id.* In this context, satisfaction of the second *Strickland* prong entails a demonstration of a "'reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Id.* (quoting *Ex parte Morrow*, 952 S.W.2d 530, 536 (Tex. Crim. App. 1997)).

Because Lopez claimed ineffective assistance of counsel as part of his motion for new trial, our ultimate task is to determine whether the trial court erred

in denying that motion. *See Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012). Accordingly, we must consider his claim using the abuse of discretion standard of review applicable to denials of motions for new trial. *Id.* This standard requires that we show great deference to the trial court, reversing only if the trial judge's decision was clearly erroneous and arbitrary. *Id.* An "appellate court must not substitute its own judgment for that of the trial court and must uphold the trial court's ruling if it is within the zone of reasonable disagreement." *Id.* As to determinations of fact, we must view the evidence in the light most favorable to the prior ruling: a trial court abuses its discretion only if no reasonable view of the evidence could support its holding. *Id.* at 457–58.

## I. Advice to plead guilty

Lopez argues that attorney Hecker grievously erred in advising him to plead guilty. He claims that Hecker incorrectly advised him that he would be eligible for probation after a plea of guilty to murder; he asserts that a Texas statute forecloses community supervision for that crime. He further argues that Hecker performed an inadequate investigation of his case before providing his advice.

### a. Availability of community supervision

In arguing that his trial counsel provided erroneous advice about the potential outcomes of his guilty plea, Lopez relies upon the provisions of the Code of Criminal Procedure dealing with judge-ordered, post-conviction community

11

supervision. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 3 (West 2006). He correctly observes that the law expressly forbids judge-ordered community supervision pursuant to Article 42.12, section 3, for those convicted of murder. *Id.* art. 42.12, § 3g(a)(1)(A).

While the notion that an attorney would incorrectly advise his client that he was eligible for probation when a statute unequivocally disallows it smacks of incompetence, Lopez's argument disregards the fact that when he pleaded guilty, he was eligible for a different category of probation, deferred-adjudication community supervision. *See id.* art 42.12, § 5. Deferred-adjudication community supervision under section 5 is closely related to judge-ordered community supervision under section 3: it allows a judge to accept a defendant's plea of guilty and place him on probation while "defer[ring] further proceedings" and refraining from entering a judgment of guilt. *Id.* Although the currently applicable law, with some exceptions, generally does not permit deferred adjudication in cases of murder, *id.* art. 42.12, § 5(d)(4), the law applicable at the time of Lopez's alleged offense contained no such prohibition.[2] The offense occurred on October 22, 2010,

---

[2]     *See* Code of Criminal Procedure, 59th Leg., R.S., ch. 722, § 1, 1965 Tex. Gen. Laws 317, *amended by* Act of May 2, 1975, 64th Leg., R.S. ch. 231, § 1, 1975 Tex. Gen. Laws 572, 572–73 (enacting the modern language on deferred adjudication), *amended by* Act of May 29, 1989, 71st Leg., R.S., ch. 785, § 4.17, 1989 Tex. Gen. Laws 3471, 3500–01 (moving this text from section 3 to section 5), *amended by* Act of May 25, 2011, 82d Leg., R.S.,

and the amendments restricting a murder defendant's eligibility for deferred adjudication are effective only for offenses committed on or after September 1, 2011. *See* Act of May 25, 2011, 82d Leg., R.S., Ch. 694, §§ 2–3, 2011 Tex. Gen. Laws 1661, 1661–62. In sum, when Lopez pleaded guilty, it was within the trial judge's power to place him on deferred-adjudication community supervision. Moreover, the record—specifically, Hecker's affidavit and the transcript of the presentence investigation hearing—reflects that Hecker was seeking deferred adjudication for his client. This was a reasonable and legally valid strategy, and as such, no basis for an ineffective assistance claim.[3]

---

Ch. 694, § 1, 2011 Tex. Gen. Laws 1661, 1661–62 (adding murder to the list of offenses for which deferred adjudication is restricted).

[3] The dissent asserts that Hecker "erroneously informed Lopez that . . . lesser-included offenses," i.e. negligent homicide, manslaughter, and sudden passion, and "defenses," i.e. self-defense and defense of a third person, "were not available . . . to him." Dissent at 29. Although this assertion is supported by Lopez's unsworn statement, it is contradicted by Hecker's affidavit. Hecker stated that he "gave a complete description to Mr. Lopez in regard to his claim that his case involved self-defense, the protection of his child and himself." The following passage from Hecker's affidavit and selectively quoted by the dissent is not to the contrary: Lopez "elected to plead guilty as it was the only possibility under the facts in this case to avoid going to prison as well as avoid a felony conviction." *See id.* at 9. Hecker's affidavit explains that Lopez wanted not only to avoid prison time but also to avert a felony conviction. He explained to Lopez that the only ways to achieve this were to attain a jury acquittal or to plead guilty and hope for deferred adjudication. Hecker specifically said, "The primary reason that the client did not want to have a jury trial in this case was that if a jury gave him adult probation it would be a conviction and his only chance to avoid a

13

## b. Inadequate investigation

Lopez also contends that Hecker failed to conduct an adequate investigation of the facts of his case in connection with his advice to plead guilty. Lopez emphasizes his allegations that Hecker did not obtain a copy of his statement to the police or the offense report until the day of the guilty plea.[4] Lopez infers this from the following facts: (1) Hecker first appeared as Lopez's attorney on November 12,

conviction was a not guilty from a jury trial or deferred adjudication probation from the court." According to Hecker's affidavit, he further described to Lopez the impediments to a successful self-defense argument given the available video evidence (which difficulties would have applied equally to a hypothetical claim of defense of a third person). He also expounded for Lopez that conviction for the lesser-included offense of manslaughter would still be a final felony conviction. In the context of the entire affidavit, it is evident that Hecker did not defy common sense and advise Lopez that a guilty plea was the "only" way to avoid a felony conviction, and the trial court reasonably could have so concluded. Moreover, Lopez's brief does not argue that Hecker rendered ineffective assistance of counsel by misinforming him as to the availability of defenses or lesser-included offenses. Rather, that argument is raised sua sponte by the dissent.

[4] Lopez's claim that Hecker's allegedly inadequate investigation rendered his guilty plea involuntary is entirely predicated on the disputed premise that Hecker failed to obtain two documents: Lopez's statement and the offense report. App. Br. at 17–19. Although the dissent attempts to bolster this argument by also criticizing Hecker's performance during the first sentencing hearing, it makes no attempt to analyze how any defect in Hecker's investigation affected the recommendation to plead guilty. The dissent's conclusion that Hecker may not have been adequately prepared for the sentencing hearing does not mean he was not adequately prepared to advise Lopez about a guilty plea months earlier, based on a reasonable investigation appropriate to that stage of the proceedings.

14

2010; (2) an assistant district attorney faxed Hecker a letter on October 6, 2011 advising him of her office's open-file policy, "[o]ut of an abundance of caution," because it was "not clear" whether Hecker had obtained a physical copy of Lopez's statement; (3) the assistant district attorney filed her letter with the court the following day; and (4) Hecker executed a confidentiality agreement with the District Attorney's office allegedly necessary to allow him access to Lopez's statement on November 14, 2011, the same day Lopez entered a plea of guilty.

Counsel has an obligation to become acquainted with the facts of the case and conduct a reasonable investigation. *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066; *see also Ex parte Lilly*, 656 S.W.2d 490, 493 (Tex. Crim. App. 1983) ("It is fundamental that an attorney must have a firm command of the facts of the case as well as the law before he can render reasonably effective assistance of counsel."). However, even assuming that failure to obtain the statement would constitute ineffective assistance of counsel, the record demonstrates that the trial court reasonably could have rejected the inference Lopez proposes.

As an initial matter, the trial court had before it the affidavit of Hecker, who flatly stated that he had received all of the State's evidence well ahead of the date of the plea in this case.[5] He also explained that several attorneys in the prosecutor's

---

[5]     Although the dissent asserts that Hecker "did not refute" Lopez's assertion that he "did not attempt to review the State's case files," Dissent at 10, and

15

office had been successively assigned to the case. Furthermore, the letter from the assistant district attorney referenced by Lopez indicates that the statement was always available to Hecker, without mention of the need to sign a confidentiality agreement. She wrote, "The state's file and the ability to view, listen to and make copies of your client's statement has been available to you during the entire pendency of this case and specifically has been available and provided to you pursuant to § 38.22 CCP and *Lane v. State* 933 S.W.2d 504 (Tex. Crim. App. 1996)." Based on this record, the trial court reasonably could have concluded that

concludes that "the record conclusively shows that . . . Hecker took no steps to obtain the State's files . . . until the day he advised Lopez to plead guilty," *id.* at 18, this depiction of the record is demonstrably wrong. As we have pointed out, Hecker's affidavit states that he received all of the State's evidence well in advance of Lopez's plea. Moreover, the letter from the assistant district attorney to Hecker and upon which Lopez relies specifically states that it was sent "[o]ut of an abundance of caution," and in substance merely asserts that "it is not clear to me whether you have a physical copy of your client's statement." The assistant district attorney's uncertainty is consistent with the additional information provided by Hecker, that "several District Attorneys" managed the case "over a period of time." An entirely reasonable inference is that the author of the letter simply had no personal knowledge whether Hecker had obtained the State's evidence, hence the communication made "[o]ut of an abundance of caution." Lastly, the letter casts doubt on whether the confidentiality agreement that Hecker signed the day of the plea was truly a prerequisite to obtaining evidence in the State's possession. The letter states that the district attorney's office "maintains an 'open file' policy" and that "[t]he state's file and the ability to view, listen to and make copies of your client's statement has been available to you during the entire pendency of this case." As noted above, the letter goes on to reference a statute and case which afford a defendant access to his statement as a matter of right.

16

Hecker had in fact obtained Lopez's statement well before the guilty plea. Since a "reasonable view of the record evidence could support its holding," *Riley*, 378 S.W.3d at 457, we cannot say that the trial court abused its discretion. *See id.*[6]

In further support of his claim based on an allegedly inadequate investigation, Lopez contends that Hecker lacked knowledge of the criminal history of Johnson (the man who beat Lopez along with the complainant). Lopez presented evidence that Hecker represented a man named "Landon Johnson" on six charges of theft, robbery, or aggravated robbery in a period spanning 1998 to 2001, and he argued that the man Hecker represented was the same Landon Johnson involved in this case. In his affidavit, Hecker averred that he did not remember representing a "Landon Johnson," and although he stated that "apparently" he had represented a man of that name, he also stated that he did not know if the man he had represented was "the same Landon Johnson who is a witness."

Lopez contends that Hecker failed to cross-examine Ford's sister and mother about Johnson's criminal history at the presentence investigation hearing. The two women had been called by the prosecution to testify about the effect of Ford's

---

[6] The dissent declares that that Hecker advised Lopez that "the penalty for manslaughter would be worse than that for murder." Dissent at 20. The dissent has provided no reference for this allegation in the appellate record, and we have found none. Hecker's affidavit explains that he considered the possibility of a manslaughter verdict, but that Lopez rejected a jury trial that could lead to conviction for a lesser-included offense because he did not want a felony conviction.

death on themselves and their families. On cross-examination, Hecker asked each if Ford or Johnson were "assaultive" people. They both denied that Ford and Johnson were "assaultive." Hecker challenged their denials by asking if evidence that they assaulted Lopez would be consistent with their characters, but he did not attempt to impeach the women with information about past offenses.

Lopez asks us to infer that Hecker was derelict in investigating the facts of the case based upon his admitted ignorance of his alleged prior representation of Johnson and from his failure to cross-examine witnesses using Johnson's alleged prior violent crimes. However Hecker, in an affidavit, explained that he "did not believe that the information concerning past criminal history of the two co-actors was as important as the immediate threat to Mr. Lopez's safety by the Complainant when he asserted that he was a gang member . . . ." As he said, "The fact that [the complainant] had been in trouble before did not present the kind of evidence needed to put Mr. Lopez in fear of imminent bodily injury or death at the time of the shooting."

Lopez also invites us to infer that the "Landon Johnson" that Hecker represented over ten years previously was the same Johnson involved in this case. That predicate laid, he then asks that we take Hecker's failure to remember representing Johnson and his failure to cross-examine on extrinsic offenses as evidence that Hecker conducted such a perfunctory investigation that he did not

18

discover his client's assailants' criminal history. Regardless of whether such a failure would rise to the level of ineffective assistance of counsel, the trial judge reasonably could have rejected this line of reasoning as overly speculative. That Hecker was unaware of the assailants' criminal histories is only one possible inference from the fact that he did not question prosecution witnesses on that subject. One reasonable alternative inference is that Hecker—recognizing that he, not the State, raised the issue of whether Johnson and Ford were "assaultive"— reasonably believed that evidence of Johnson's and Ford's past crimes was inadmissible character evidence.[7] The trial judge also could have reasonably

---

[7] *See* TEX. R. EVID. 404(b). The dissent contends that Hecker could have impeached the State's witnesses using Johnson's past convictions, relying upon *Torres v. State*, 71 S.W.3d 758 (Tex. Crim. App. 2002). *See* Dissent at 25 n.1. The specific quote from *Torres* relied upon by the dissent states: "Specific, violent acts of misconduct may be admitted to show the reasonableness of the defendant's fear of danger, or to show that the deceased was the first aggressor." 71 S.W.3d at 760. The dissent omits *Torres*'s important qualifying statement that follows: "But specific acts are admissible only to the extent that they are relevant for a purpose other than character conformity." *Id.* The qualification is necessary because Rule 404(a) authorizes proof that a person acted in conformity with his violent nature, but that rule is limited by Rule 404(b), which generally prohibits evidence of specific incidents of past misconduct. The prohibition of Rule 404(b) does not apply when the incident of past misconduct is not offered to show action in conformity with character, but it is instead offered for some other permissible purpose, such as proving "the reasonableness of the defendant's fear of danger" or that "the deceased was the first aggressor." *Torres*, 71 S.W.3d at 760.

inferred that Hecker was more concerned with highlighting the threats and assault that preceded the shooting than delving into the assailants' pasts—particularly in light of Hecker's testimony that he believed Ford's and Johnson's criminal histories were not as important to his client's defense as evidence that Ford had made an overt threat. *See Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S. Ct. 1, 5 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."). Again, since a "reasonable view of the record could support the trial court's ruling," *Riley*, 378 S.W.3d at 457, we cannot say that it abused its discretion. *See id.*

---

In this case, the alternative purposes postulated by the Court of Criminal Appeals in *Torres*, "the reasonableness of the defendant's fear of danger" or that "the deceased was the first aggressor," are not applicable to Johnson's criminal history. There is no evidence in the record to suggest that Lopez was aware of Johnson's history of violent misconduct, so as to make the criminal history relevant to showing the reasonableness of Lopez's fear. The criminal history also did not tend to demonstrate that Johnson and Ford were the first aggressors, and in any case there was no dispute that they were the first aggressors. Nor could Hecker have reasonably hoped to introduce past convictions as impeachment evidence when it was not the State but Hecker who raised the character issue by asking the State's witnesses whether Johnson and Ford were "assaultive." *See Hammett v. State*, 713 S.W.2d 102, 105 n.4 (Tex. Crim. App. 1986) (prohibiting such "bootstrap[ping]" during cross-examination).

## II.  Conflict of interest

Lopez also argues that Hecker had a conflict of interest arising from his prior representation of Johnson. He argues that this conflict of interest was manifest in Hecker's failure to impeach the prosecution's witnesses with evidence of Johnson's prior crimes. Hecker's professional obligation to keep Johnson's confidences, Lopez contends, placed him in an unacceptable dilemma between keeping faith with his former client and being the best advocate possible for his present client. According to Lopez, the dilemma forced two mistakes on Hecker's part: desultory cross-examination of prosecution witnesses at the presentence investigation hearing and advice to plead guilty so as to avoid a trial in which competent counsel would seek to expose the criminal backgrounds of Johnson and Ford.

Insofar as Lopez argues that he received ineffective assistance of counsel at his first punishment hearing, his claim is moot. The results of that hearing were entirely supplanted when the trial judge granted Lopez a fresh punishment hearing and a reduced sentence. There is no allegation that anything which occurred during the first punishment hearing prejudiced Lopez at the second punishment hearing. Claims of error contaminating the original sentencing hearing are therefore moot. This leaves us to consider Lopez's claim that Hecker's alleged conflict of interest infected his advice to plead guilty.

When a defendant is claiming that the ineffective assistance he received from his lawyer was a matter of conflict of interest, the more liberal standard propounded in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708 (1980), is used instead of the *Strickland* test. *Acosta v. State*, 233 S.W.3d 349, 352–53 (Tex. Crim. App. 2007). An appellant must show that "his trial counsel had an actual conflict of interest, and that the conflict actually colored counsel's actions during trial." *Id.* at 356. For purposes of applying this standard, the Court of Criminal Appeals has held that, "'[A]n "actual conflict of interest" exists if counsel is required to make a choice between advancing his client's interest in a fair trial or advancing other interests (perhaps counsel's own) to the detriment of his client's interest.'" *Id.* at 355 (alteration in original) (quoting *Monreal v. State*, 947 S.W.2d 559, 564 (Tex. Crim. App. 1997)). "[T]he possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler*, 446 U.S. at 350, 100 S. Ct. at 1719. Instead, to prevail under this standard, it must be shown that counsel "actually acted on behalf of those other interests during the trial." *Owens v. State*, 357 S.W.3d 792, 794 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (citing *Cuyler*, 446 U.S. at 349–50, 100 S. Ct. at 1719); *see also Routier v. State*, 112 S.W.3d 554, 582 (Tex. Crim. App. 2003) (requiring the additional showing that the attorney's actual conflict "adversely affected counsel's performance"); *Rivera v. State*, 405 S.W.3d 729, 736 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd).

As Lopez made his conflict of interest claim in his motion for new trial, we review for abuse of discretion. *See Riley*, 378 S.W.3d at 457. We will reverse only if the trial judge's decision was clearly erroneous and arbitrary and no reasonable view of the evidence could support its holding. *Id.*

Lopez argues that the "two most plausible defensive strategies" available to Hecker were self-defense and defense of a third person, and that these strategies would have forced Hecker to raise Johnson's prior conviction for aggravated robbery with a deadly weapon. Doing so, Lopez asserts, would likely cause Hecker to violate the attorney–client privilege. Hecker then must have felt that he could extricate himself from this dilemma with a guilty plea that would avoid the necessity of presenting Lopez's self-defense, defense of a third person, sudden passion, and manslaughter theories. Lopez offers Hecker's performance on cross-examination—failing to raise past offenses in impeachment, soliciting testimony favorable to the images of Ford and Johnson—as evidence that he was influenced by this predicament.

Mindful of the abuse of discretion standard that governs this case, we cannot conclude that the trial court behaved arbitrarily in refusing to give credence to Lopez's conjectures. The above chain of reasoning does not establish a compelling inference that Hecker's advice to Lopez to plead guilty was tainted by an actual conflict of interest. Lopez offers only two pieces of evidence in support of his

23

claim: inconclusive evidence that Hecker may have represented Johnson a decade ago and Hecker's allegedly poor performance during cross-examination. As an initial matter, the trial court was not bound to join in Lopez's speculation that the reason Hecker did not more aggressively question the complainant's relatives was that he knew that doing so would violate duties owed to his former client Johnson. A trial court could reasonably reject that inference and assume that Hecker had other strategic motives for his actions. *See Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."). Indeed, Hecker averred in an affidavit that he did not think Johnson's and Ford's criminal histories to be as important as the threats they made in Lopez's presence. Equally, the trial court could have believed Hecker when he avowed that he did not remember having represented a man named "Landon Johnson." If Hecker was not aware of the facts allegedly creating a conflict, he could not have been forced "to make a choice between advancing his client's interest in a fair trial or advancing other interests." *Acosta*, 233 S.W.3d at 355. In light of Hecker's affidavit stating that he did not remember representing Johnson, the alternative explanation he offered for his mode of interrogating complainant's relatives, and the speculation otherwise required to accept Lopez's contentions, it was not an

24

abuse of discretion for the trial court to deny a new trial on the basis of the alleged conflict.

## Conclusion

As the trial judge did not abuse her discretion in refusing to grant Lopez's request for a new trial, we affirm.

<br>
<br>

                                     Michael Massengale
                                     Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Justice Keyes, dissenting.

Publish. TEX. R. APP. P. 47.4.