IN THE COURT OF CRIMINAL APPEALS

OF TEXAS






PD-0571-05






PAUL ACOSTA, Appellant


v.


THE STATE OF TEXAS






On Discretionary Review of Case 04-03-00583-CR

of the Fourth Court of Appeals, 

Bexar County





Womack, J., delivered the opinion of the Court, in which Meyers, Price,
Johnson, Hervey, Holcomb, and Cochran, JJ., joined. Keller, P.J.,
filed a concurring opinion, in which Keasler, J., joined.


 The appellant in this case claims that he received ineffective assistance of counsel at trial due to
his attorney's conflict of interest. The Fourth Court of Appeals disagreed and affirmed the trial court's
judgment. We granted review to decide whether the Court of Appeals used the proper standard to
decide whether trial counsel in fact had a conflict of interest, and whether it conducted the proper harm
analysis. We hold that the Court of Appeals erred in the standard itused, and we will therefore reverse
and remand. The Facts

 The appellant was charged with aggravated sexual assault of a child, (1) the victim being his own
seven-year-old daughter. The appellant's wife Margaret, the victim's mother, came home one morning and
found their daughter sleeping nude in their bed with the appellant. Margaret immediately took her daughter
aside and asked in various ways if the appellant had touched her inappropriately. The victim's answers
were not clear, but Margaret was concerned enough to contact her local child-protective services.
Margaret also asked the appellant to leave their home. 

 Two CPS investigators came the next day and interviewed the victim. That interview was recorded
on audiotape. When the interview was concluded, the lead investigator, Virgil East, had Margaret sign a
statement agreeing to keep the appellant away from his daughter. East also filed an offense report against
the appellant with the Sex Crimes Unit of the San Antonio Police Department. The audiotaped interview
was transcribed, and East also prepared a written summary of it. Before trial, the State requested that East
be allowed to testify as to the statements made to him by the victim during this interview as an "outcry"
witness. (2) The trial court denied the motion, and also ruled that the audiotaped interview would be
inadmissible at trial, except perhaps for impeachment purposes.

 Meanwhile, Margaret came to believe that no assault had occurred and had taken the appellant
back into their home. While the appellant was in jail awaiting trial, Margaret was assisting his trial counsel,
Joe Stenberg, in the preparation of his defense. Nevertheless, child-protective services was concerned that
the appellant might eventually return to live in the same home as the victim. They contacted Margaret, and
she then felt that she was in danger of losing custody of her daughter, regardless of the outcome of the trial,
if she continued to have the appellant live in their home.

 At some point before trial, Margaret approached Stenberg and asked for his help in resolving her
custodial matter with child-protective services. At first, Stenberg declined to help Margaret, informing her
that he was not her attorney. Margaret persisted however, and Stenberg eventually sympathized with her
plight because she could not afford her own attorney and because she had expended great time and effort
assisting Stenberg in the preparation of the appellant's defense.

 During his review of all the evidence in the appellant's case, Stenberg concluded that East had
exaggerated or even fabricated facts in the summation he prepared of his interview with the victim.
According to Stenberg, certain statements damaging to the appellant's defense, and which East in his
summation attributed to the victim, were simply not found in the audiotaped interview. Surmising that child-protective services would rely upon that interview and summation in any proceedings against Margaret,
Stenberg decided that the best way to help Margaret would be to discredit East.

 During trial, the State called East to testify. Because of the pretrial ruling, East did not testify as to
any specific statement made to him by the victim. Rather, East explained his duties as an investigator, and
said that he interviewed the victim in this case, and that he took certain actions as a result of the interview.
On cross-examination however, Stenberg asked East more specifically about the interview he conducted
with the victim. Stenberg then played the audiotape of the interview in its entirety for the jury to hear.
Among the exchanges the jury heard on the tape was the following:

 [MR. EAST]: How did he touch you there?

 [S.A.]: With his private.

 Q: With his what?

 A: Private.

 Q: With his private?

 A: Uh-huh.

 Q: Did he put his private part in your - in your butt, too?

 A: Yes.

 (break)

 Q: Okay. And it - it was big and hard, right?

 A: (No verbal response)

 Q: Can you say yes?

 A: Yes.

 Q: Okay. And he put it in your behind, also?

 A: Yes.

 Then, in an attempt to impeach East, Stenberg had him read the summation of the interview out loud
for the jury. There were some apparent inconsistencies between the statements made on the tape and
East's summation, which Stenberg hit upon repeatedly in an attempt to undermine East's credibility.
Stenberg acknowledged in a later affidavit that he explained to the appellant neither the implications of
introducing these otherwise inadmissible statements, nor the potential conflict of interest in attempting to
help Margaret during the appellant's trial.

 During its deliberations, the jury requested the tape and a "boom box" with which to listen to it
again. The jury found the appellant guilty, and the trial court assessed punishment at twenty years of
confinement. (The appellant, through Stenberg, had rejected an offer of two years before trial.). 

 The appellant filed a motion for a new trial, and the trial court conducted a hearing. Represented
by new counsel, the appellant called Stenberg to testify. Stenberg testified that he realized during jury
argument that he had made a mistake by playing the audiotaped interview for the jury. Stenberg also
admitted that the introduction of that evidence was "solely to help Margaret" and "no help whatsoever to
[the appellant]." Stenberg's testimony was supported by his affidavit, which was attached to the motion
for new trial. The trial court denied the motion.

 On appeal, the appellant claimed he had received ineffective assistance of counsel due to
Stenberg's conflict of interest in attempting to help Margaret during the appellant's trial, as well as
Stenberg's failure to object to the admission of inadmissible hearsay testimony. The Fourth Court of
Appeals, citing one of its own decisions, (3) held that the appellant's claim should be governed by the
standards articulated in Strickland v. Washington:

If a defendant claims ineffective assistance based on a conflict of interest in the context
of the joint representation of codefendants in one criminal proceeding, a lesser burden
of proof is imposed than when the ineffective assistance of counsel claim is based on
attorney error. In that context, the defendant is only required to show that his counsel
actively represented conflicting interests and that the conflict of interest actually affected
the adequacy of his representation; the law then imposes an automatic presumption of
prejudice. Where the conflict of interest, however, involves the advancement of
interests other than a jointly represented codefendant (such as counsel's self-interest),
no presumption of prejudice arises, and the defendant must prove prejudice by showing
a reasonable probability that, but for counsel's unprofessional errors, the result of the
proceedings would have been different. (4)

 

The Court of Appeals ruled that the objectionable statements were merely cumulative of other admissible
testimony. Nor were they persuaded that the jury's request to listen to the tape again during deliberations
necessarily affected their verdict. Thus, the Court held that prejudice had not been established, and affirmed
the trial court's judgment. We granted review.

Conflict of Interest

I. Cuyler, Beets, and Monreal

 The Court of Appeals' decision in this case relied on Monreal. (5) In that case, we granted review
to determine whether the Court of Appeals had used the proper standard in determining that the appellant
had failed to demonstrate an actual conflict of interest. (6) This was an important issue because ineffective-assistance claims are usually analyzed under the Strickland standard, which requires the appellant to
demonstrate both unreasonable conduct under prevailing professional norms (7) and actual prejudice to his
case. (8) However, when it is asserted that the ineffective assistance derived from a conflict of interest, the
proper standard is that which the Supreme Court articulated in Cuyler v. Sullivan: (9) in order to prevail the
appellant need show only that trial counsel "actively represented conflicting interests" and that counsel's
performance at trial was "adversely affected" by the conflict of interest. (10)

 In Monreal, just after the State rested, the appellant's trial counsel put the appellant on the witness
stand for the sole purpose of entering into the record that she had advised him before trial of a plea offer
from the State, and he had rejected it. It was undisputed that trial counsel's sole purpose in doing so was
to protect herself against a future claim of ineffective assistance of counsel by the appellant. On appeal, the
appellant claimed that this constituted a conflict of interest, and that he suffered harm from it by the
introduction of otherwise inadmissible evidence, namely, the rejected plea agreement. (11) Finding no Texas
cases which directly addressed this type of conflict, the Court of Appeals turned to Beets v. Scott, (12) a
ruling by the Fifth Circuit Court of Appeals. 

 In Beets, the appellant claimed her defense counsel labored under a conflict of interest because he
had negotiated a contract for the media rights to her story and because he was potentially a material
exculpatory witness to her case. (13) Noting that "the federal circuit courts have unblinkingly applied Cuyler's
'actual conflict' and 'adverse effect' standards to all kinds of alleged attorney ethical conflicts," (14) the Fifth
Circuit Court surveyed Cuyler and similar Supreme Court cases and found that:

[O]nly in the multiple representation context is the duty of loyalty so plain. Only then is
the risk of harm high enough to employ a near-per se rule of prejudice. While loyalty
may be implicated in other judgments a lawyer makes, in no other category of conflicts
is the risk of prejudice so certain as to justify an automatic presumption. (15)


The Court then concluded that a conflict of interest other than a claim of multiple representation should be
governed by Strickland. (16)

 In Monreal, the Fourth Court of Appeals echoed the findings of Beets:

[W]here the conflict is one of self interest, the conflict does not necessarily result in
harm to the client. Insofar as the protections to the client are concerned, it does not
follow that a client will be denied a fair trial simply because his lawyer has a self-interest
at stake. Granted, in looking out for himself, a lawyer may do or fail to do something
that causes damage to his client's case. But this is not always true. A lawyer's personal
interest conduct may very well have no effect on whether or not his client receives a fair
trial. (17)


Thus, adopting the reasoning of Beets, the Court of Appeals held that "claims of ineffective assistance of
counsel based upon a conflict of interest between the attorney's self-interest and his client's interests are
controlled by the standards announced in Strickland v. Washington." (18)

 Applying Monreal to the instant case, the Court of Appeals chose to move arguably further than
the narrow standard first articulated in Beets. Instead of merely an exception for cases where the conflict
is between the defendant's and the lawyer's personal interests, in this case the Court of Appeals held:

Where the conflict of interest, however, involves the advancement of interests other
than a jointly represented codefendant (such as counsel's self-interest), no presumption
of prejudice arises, and the defendant must prove prejudice by showing a reasonable
probability that, but for counsel's unprofessional errors, the result of the proceedings
would have been different. (19)


Thus, the Court of Appeals drew a clear distinction between conflict of interest cases involving
codefendants, which will be governed by Cuyler, and all other conflicts ("such as counsel's self-interest"),
which will fall under Strickland. The Court of Appeals then held that the alleged conflict in the appellant's
case was of the latter class, and that he therefore had failed to meet his burden of showing prejudice. (20) 

 Although we respect the Fifth Circuit's opinion on matters of constitutional jurisprudence, the fact
remains that the Supreme Court has yet to decide on the issue of whether Cuyler is limited to cases of
multiple representation, as the Fifth Circuit and the San Antonio Court of Appeals have asserted it does.
The majority in Beets states plainly that "The Supreme Court has not expanded Cuyler's presumed
prejudice standard beyond cases involving multiple representation." (21) The most obvious response to that
observation, however, is that the Supreme Court has never expressly limited Cuyler to such cases either.
Indeed, we found that, the only time the Supreme Court even considered the question of whether Cuyler
is limited to a particular type of conflict, it concluded that the issue was "an open question." (22)

 Nevertheless, we see no reason why the conflict presented in this case should be incompatible with
either Cuyler or Beets. While Cuyler was in fact a case of multiple representation, that fact is always
secondary to the primary issue in all conflict of interest cases: whether the conflict asserted actually resulted
in ineffective assistance of counsel to the defendant. Beets, in evaluating a conflict between a lawyer's self-interest and that of his client, concludes that Cuyler should apply only in the context of multiple
representation because only in that context are the effects of breaching the duty of loyalty clear. (23) We
respectfully submit that the instant case, in which the appellant's trial counsel actively represented the
interests of a third party during the appellant's trial, is a clear example of how the danger of ineffective
assistance via a conflict of interest is not strictly limited to the codefendant context. (24)

 In fact, it does not seem difficult to glean a workable standard out of Cuyler without limiting it to
the multiple representation context. Its essential holding is:

[A] defendant who shows that a conflict of interest actually affected the adequacy of his
representation need not demonstrate prejudice in order to obtain relief. But until a
defendant shows that his counsel actively represented conflicting interests, he has
not established the constitutional predicate for his claim of ineffective assistance. (25)


In other words, the appellant must show that an actual conflict of interest existed and that trial counsel
actually acted on behalf of those other interests during the trial. This rule does not conflict with Beets, where
it was also held in the alternative that no actual conflict existed under the Cuyler standard, even if that
governed the case. (26)

 And while the Supreme Court has not ruled on the issue of whether Cuyler is limited to multiple-representation conflicts, it has voiced support for the more essential point that the ultimate question is
whether any such conflict hindered the effective assistance of counsel at trial:

This is not to suggest that one ethical duty is more or less important than another. The
purpose of our Holloway and [Cuyler] exceptions from the ordinary requirements of
Strickland, however, is not to enforce the Canons of Legal Ethics, but to apply needed
prophylaxis in situations where Strickland itself is evidently inadequate to assure
vindication of the defendant's Sixth Amendment right to counsel. (27)


Our holding today then should be viewed as in line with the Supreme Court's rationale for providing this
exception to the Strickland standard.

II. Monreal and the Case at Hand

 Turning now to the instant case, this Court has never drawn any distinction between "types" of
conflict of interest that may form the basis of a claim of ineffective assistance of counsel. While we affirmed
the Court of Appeals' judgment in Monreal, we did not adopt the Court of Appeals' reasoning in doing
so. Rather, our analysis in that case focused on the first prong of Cuyler; that is, was trial counsel burdened
by an actual conflict of interest in that case? We phrased the proper rule in such a case as the following:
"[A]n 'actual conflict of interest' exists if counsel is required to make a choice between advancing his
client's interest in a fair trial or advancing other interests (perhaps counsel's own) to the detriment of his
client's interest." (28) Because we found that no such conflict existed in Monreal, we held that the Court of
Appeals did not err in analyzing the appellant's ineffective-assistance claim under the Strickland test. (29)

 The Court of Appeals in this case interpreted our affirmance of Monreal as an adoption of their
rule that the Cuyler test would apply only in a conflict-of-interest case in which the lawyer was representing
codefendants, and not to any other type of conflict-of-interest, such as in the case at hand. The difference
in language between the two Monreal opinions, however, is crucial. While the Court of Appeals held that
a conflict involving a lawyer's self-interest would never give rise to the Cuyler presumption of prejudice, (30)
we expressly stated that trial counsel's self-interest. could conceivably be an "actual conflict of interest"
under Cuyler (31) Thus, we did not adopt the Fourth Court of Appeals' narrower view of conflict-of-interest
cases in Monreal, and we do not do so now.Conclusion In short, the proper standard by which to analyze claims of ineffective assistance of counsel due
to a conflict of interest is the rule set out in Cuyler v. Sullivan, that is, the appellant must show that his
trial counsel had an actual conflict of interest, and that the conflict actually colored counsel's actions
during trial. We will reverse and remand to the Court of Appeals for reconsideration of this case under
that standard. 

Delivered: September 12, 2007

Publish

 
1. Penal Code § 22.021(B).
2. Code Crim. Proc. § 38.072.
3. Monreal v. State, 923 S.W.2d 61 (Tex. App. - San Antonio 1996).
4. Acosta v. State, 04-03-00583-CR, 2005 Tex. App. LEXIS 1413, 5-6 (Tex. App. - San Antonio 2005) (not
designated for publication) (citations omitted).
5. Monreal v. State, 947 S.W.2d 559 (Tex. Cr. App. 1997).
6. Id., at 564.
7. See Strickland v. Washington, 466 U.S. 668, 688 (1984).
8. See id., at 693.
9. 446 U.S. 335 (1980).
10. Id., at 349-50 (1980).
11. R. Evid. 410.
12. 65 F.3d 1258 (5th Cir. 1995).
13. Id., at 1272.
14. Id., at 1266.
15. Id., at 1270-71.
16. Id., at 1272.
17. Monreal, 923 S.W.2d, at 65.
18. Id., at 66.
19. Acosta, 2005 Tex. App. LEXIS 1413, at 5-6 (quoting Strickland, 466 U.S. at 687).
20. Id., at 8.
21. Beets, 65 F.3d, at 1265.
22. Mickens v. Warden, 535 U.S. 162, 176 (2002).
23. Beets, 65 F.3d, at 1270.
24. Indeed, the Beets majority, in attempting to bolster its more narrow view of Cuyler, cites Wood v.
Georgia, 450 U.S. 261 (1981). In that case, the alleged conflict was the fact that trial counsel, who was representing
three codefendants accused of obscenity charges, was being paid by the defendants' common employer. The Beets
court characterized the situation as "the functional equivalent of a joint representation" as a way of explaining the
Supreme Court's holding that Cuyler applied to that situation. Beets, 65 F.3d at 1267. Whether the Fifth Circuit's
explanation is valid or not, if they choose to analogize in such a manner, it should not be difficult to analogize the
appellant's situation in the instant case as a multiple representation as well.
25. Cuyler, 446 U.S., at 349-50 (emphasis added).
26. Beets, 65 F.3d, at 1277-79.
27. Mickens, 535 U.S., at 176.
28. Monreal, 947 S.W.2d at, 564 (citing James v. State, 763 S.W.2d 776, 779 (Tex. Cr. App. 1989).
29. Id., at 565.
30. Monreal, 923 S.W.2d, at 65.
31. Monreal, 947 S.W.2d at 564 (". . . or advancing other interests (perhaps counsel's own) to the detriment. .
. .") (emphasis added).