Opinion issued February 4, 2014



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-12-00997-CR

_____

**JOHN ANTHONY LOPEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Case No. 1282701**

---

## DISSENTING OPINION

I respectfully dissent. Appellant, John Anthony Lopez, appeals his conviction for murder entered after a plea of guilty. Lopez argues in two issues that he received constitutionally ineffective assistance of counsel and is entitled to a new trial because: (1) his trial counsel erroneously advised him that he would be

eligible for community supervision only if he pled guilty to murder, rendering his guilty plea involuntary, and his counsel's failure to investigate and to introduce mitigating and rebuttal evidence was constitutionally inadequate and deprived him of a fair trial; and (2) his trial counsel's prior representation of the complainant's brother-in-law, a participant in the events leading to the complainant's death, adversely affected counsel's ability to represent him and, likewise, deprived him of a fair trial.

I would conclude, on the basis of the facts in the record and controlling law, that: (1) Lopez's trial counsel conducted a constitutionally inadequate investigation into the facts and was constitutionally ineffective in failing to offer mitigating and rebuttal evidence on Lopez's behalf; (2) Lopez's trial counsel was constitutionally compromised by his conflict of interest in having represented Landon Johnson, one of Lopez's two assailants in the underlying incident, on six charges of theft, robbery, and aggravated robbery in a period spanning from 1998 to 2001; (3) Lopez's trial counsel's advice that Lopez plead guilty to murder without an agreed recommendation as to punishment as the only way to receive community supervision and avoid jail time was erroneous and coercive and deprived Lopez of his constitutional right to present his defenses to the murder charge; and thus (4) Lopez's trial counsel's representation fell below an objective standard of professional representation and deprived Lopez of a fair trial. I would restate and

2

supplement the relevant facts as follows, and I would reverse and remand for a new trial.

## Background

On the afternoon of October 22, 2010, Lopez visited a Wing Stop with his four-year-old daughter. Lopez was a twenty-nine-year-old Houston native and high school graduate with a consistent employment history, including positions as a supervisor to other employees. His criminal record consisted of four misdemeanor convictions, all stemming from 2003, the year he graduated from high school. While his daughter played just inside the restaurant's doors, Lopez took a place in line to order food from the cashier. The complainant, Travone Ford, and his brother-in-law, Landon Johnson, were standing in line in front of Lopez. Once Lopez reached the front of the line, he took time to speak with the cashier about a special discount. Lopez's dialogue with the cashier was interrupted by Ford, who returned to add a drink to the order he had just placed. Lopez asked Ford to hold on until he was finished. According to Lopez's testimony, this request perturbed Ford, who demanded that Lopez say "please" and threatened Lopez by stating he was a member of the Bloods street gang and would leave Lopez "bloody." Lopez gathered up his daughter and left the restaurant.

Lopez testified by sworn declaration attached to his motion for new trial that, as he was leaving the restaurant, he overheard Johnson encouraging Ford to

3

follow and fight him. When he got outside, he opened his trunk, looked inside, and then closed it. He could see Johnson and Ford through the windows and glass door of the restaurant standing inside by the front door, and he heard Johnson instigating Ford to go outside and fight him.

After he placed his daughter in the back seat of the car, Lopez decided "to try to diffuse the situation verbally" and approached the two men. They met him at the door. Johnson began to choke Lopez and threw him against the trunk of a car in the parking lot, and both Ford and Johnson began punching him. While trying to avoid blows to his head, Lopez tripped and fell onto the ground, which prompted Ford and Johnson to switch to kicking him in the body and face. As Lopez's daughter screamed in response to the attack on her father, Johnson and Ford allowed Lopez to return to his feet. But they continued to assault him with punches as they pinned him against the wall of the Wing Stop. After delivering a final blow that once again knocked Lopez to the ground, they gave him back his keys, which had fallen, and Ford told Lopez that he was lucky Ford and Johnson did not shoot him, that the next time they saw him he should hope not to have his daughter with him, and that he would kill him. Lopez testified that this threat frightened him and put him in fear not only for his own life but for that of his daughter. He stumbled into his car as Johnson and Ford watched him.

4

As Lopez began to reverse his way out of the parking lot, Ford climbed into his own car and reversed it in the same direction as Lopez. As Ford was reversing his car in the parking lot, Lopez stopped his car, retrieved a shotgun from the trunk, and shot at the rear of Ford's vehicle. Ford sped off. Time stamps from the Wing Stop's security camera footage show that approximately twenty-four seconds elapsed from the time Lopez exited his vehicle to retrieve his shotgun and the time he fired the shot at Ford's car. Lopez stated that the shot he fired was aimed at the car's bumper in order to "deflect him away." He stated that because of the injuries he had suffered, he was unsure whether he could successfully retreat from another potential attack at the hands of Ford and that he was not thinking with a clear mind because of the attack. It was not immediately clear to Lopez that Ford had been hit or wounded, as Ford began to travel forward and drive out of the parking lot after Lopez fired the shot. The bullet, however, had entered Ford's car just above the bumper and had traveled through two rows of seats, striking Ford and mortally wounding him.

After firing the shot and seeing Ford's car leave the scene, Lopez travelled directly to his mother's house, where she treated his injuries. He learned that Ford had died that same evening when news covering the incident at the Wing Stop was broadcast locally. Hours after the incident occurred, Lopez voluntarily turned himself in to the Stafford Texas Police Department and cooperated with the police

investigation into Ford's death. Pictures of Lopez taken by law enforcement personnel after he turned himself in demonstrated numerous large cuts to his face, back, and hands. Lopez also suffered a large knot on the top of his head and considerable swelling to his face.

Photos from the investigation into the incident revealed that the car Ford was driving contained a single bullet hole directly above the back bumper. Photos also revealed two cups of alcohol in the car's center console and a large bottle of vodka in the front passenger area. The car's trunk held a disassembled handle and trigger mechanism for a pistol, and the barrel and slide of the same pistol were in the interior door panel of the front passenger area. An autopsy performed on Ford revealed that, at the time of his death, he had a blood alcohol level of 0.10 and also had benzoylecgonine, the main metabolite of cocaine, in his system, indicating that he had ingested an indeterminate amount of cocaine within twenty-four to forty-eight hours prior to his death.

Lopez hired attorney Don Hecker to represent him. According to both Lopez's unsworn declaration and Hecker's affidavit, presented at the hearing on Lopez's motion for new trial, Hecker advised Lopez to plead guilty to murder without a sentencing recommendation as the only way for Lopez to avoid jail time and a felony on his record.

6

At the presentence investigation ("PSI") hearing, rather than cross-examine the complainant Ford's aunt and guardian, Alecia Roberts, about Ford's violent nature, Hecker elicited information from her about Ford's educational background and employment history, then he asked her whether she knew Ford to be an assaultive individual. When she answered "no," Hecker followed up with a question about Ford's employment history as a truck driver rather than confronting her with Ford's prior conviction for assault with a deadly weapon. Similarly, when Hecker questioned Johnson's wife, Kaylon Johnson, about whether either Ford or Johnson, Ford's brother-in-law and Lopez's co-assailant, had an assaultive nature, he permitted her to give an unchallenged narrative answer that they were not assaultive, were not confrontational, and would allow anyone that they might happen to assault to leave, as, she testified, they had done in the present case. Hecker did not seek to introduce evidence of Johnson's or Ford's violent pasts and prior criminal records or photographs of Ford, available on the internet, showing him wearing a red bandana and exhibiting apparent gang signs.

Hecker also allowed the State to elicit characterization of the events shown on the surveillance camera at the restaurant in a way adverse to Lopez, without rebuttal and without having shown Lopez either his statement or the video prior to trial to allow him to refresh his memory of the events and inform his counsel.

The trial court assessed Lopez's punishment at eighteen years' incarceration.

Lopez then dismissed Hecker in favor of attorney Brittany Carroll and filed a motion for new trial.

At the hearing on Lopez's motion for new trial, Lopez, his mother, and his fiancée all presented affidavits attesting to Hecker's assurance that Lopez could avoid going to jail by pleading guilty to murder.

Lopez averred:

> Mr. Hecker told me that if I went to the Judge for a PSI hearing the Judge was going to give me probation. He told me that I had two options: 1) go to trial and risk going to jail, or 2) plead guilty to a PSI and get probation, but that if I was going to plead "guilty" that I should do so quickly because the Judge might change her mind about giving me probation. When the Judge read the admonishments I thought that was just procedural, and that the Judge and Mr. Hecker had already discussed punishment, and that we just had to go through the PSI hearing. Mr. Hecker told me the purpose of the PSI interview was to see if I was a good candidate for probation. I trusted that my attorney was telling me the truth. I did not know that the law did not allow the Judge to give me probation if I pled guilty to Murder. My attorney never discussed receiving deferred adjudication. I would not have pled guilty and waived a jury trial but for my attorney telling me that I would receive probation.

Three affidavits by Hecker were also introduced at the motion for new trial hearing. According to his own affidavit, Hecker advised Lopez that he could receive probation but could also receive a sentence of five to ninety-nine years. He stated, "I told him, as the Court did at the time of the plea, that there was absolutely no way anyone could predict which of these alternatives the Judge would select in this case." He also stated, "The primary reason that the client did

8

not want to have a jury trial in this case was that if a jury gave him adult probation it would be a conviction and his only chance to avoid a conviction was a not guilty from a jury trial or deferred adjudication probation from the Court. He selected the plea to the Court after I thoroughly went over the facts of this case." Hecker then described the facts as they had been presented by the prosecution at trial and averred that these made the defense of self-defense unavailable to Lopez. He then averred:

> I thoroughly explained to Mr. Lopez on several occasions that the range of punishment was 5 years to 99 years or life as well as a possible $10,000 fine. I also explained to him that if in fact the jury convicted him of the lesser-included offense of manslaughter and they gave him probation for 2-10 years or penitentiary time for 2-20 years there would still be a final felony conviction. Again, *he elected to plead guilty as it was the only possibility under the facts in this case to avoid going to prison as well as avoid a felony conviction. . . .* There is no question in my mind that he thoroughly understood every option available to him prior to his plea of guilty.

(Emphasis added.)

Lopez also testified by unsworn declaration that Hecker did not advise him of the possible defenses of self-defense or defense of a third person; nor did he advise him that, should he go to trial, the State would have the burden of proving intent before he could be convicted of murder. He also testified that Hecker did not interview him about the incident prior to trial; did not refresh his memory about the incident with his own statement, which he had given to police; did not advise him that photographs of his injuries were available as evidence; and did not

9

show him the surveillance video. Nor did Hecker introduce the photograph of Ford's vehicle, showing the bullet entering just above the rear bumper, corroborating Lopez's account of events, or call the experienced Stafford Police sergeant who participated in the investigation and was ready and willing to testify, based on his investigation, training, and experience, that Lopez did not intend to kill anyone.

Lopez also presented evidence, which Hecker did not refute, that Hecker appeared in the case a year before the trial but did not attempt to review the State's case files, including Lopez's statement; that an assistant district attorney advised Hecker of his right to review the files a month before trial, stating that they had been open to him all along; and that Hecker first signed the required confidentiality agreement for permission to review the file on the date he advised Lopez to plead guilty. In his own affidavit, Hecker conclusorily averred that the evidence had all been available to him for a year and that he had done a thorough investigation. He did not deny any of the facts of his investigation and representation cited by Lopez.

Lopez further testified that Hecker failed to introduce evidence of Ford's arrest for a terroristic threat in 1998, Ford's plea of guilty to assault on a public servant in 2000, or Ford's being on community supervision for robbery at the time of his death. Hecker also failed to introduce into evidence the two halves of a pistol found in the front area of Ford's car; the bottle of vodka found in the front

seat; or the metabolite of cocaine and the 0.10 alcohol level found in Ford's system at the time of his death. Hecker did not introduce pictures of Ford, available on the internet, wearing a red bandana and displaying what appeared to be gang signs.

In addition, Lopez presented evidence that Hecker had represented Johnson, the complainant's brother-in-law who participated in the assault on Lopez at the Wing Stop, in six criminal prosecutions between 1998 and 2001 in both Fort Bend and Harris counties. These included a 1998 theft charge in Fort Bend County, in which Johnson pleaded guilty and was sentenced to three years' probation; a 1999 Fort Bend County theft charge, which resulted in one year of confinement; a 1999 Harris County robbery charge, which resulted in six years' confinement; a 2000 Harris County charge of aggravated robbery with a deadly weapon, which resulted in five years' confinement; a 2001 Fort Bend County robbery charge, which resulted in six years' confinement; and a second 2001 Fort Bend County robbery charge, which resulted in six years' confinement. Lopez averred that Hecker did not reveal to him his prior representation of Johnson.

Lopez stated, "If I had known all this information I would never have pled guilty and waived my right to a jury trial."

Hecker denied remembering Johnson, but he also confirmed in his affidavit that he had represented Johnson and that he never told Lopez that he had represented "a Landon Johnson."

11

The trial court denied Lopez's motion for new trial as to guilt and granted it as to punishment only. After a new punishment hearing, the trial court entered a second judgment of conviction and assessed Lopez's punishment at fifteen years in prison. Lopez responded with a second motion for new trial as to both guilt and punishment, which the trial court denied. Lopez now appeals that denial. The majority affirms the judgment of the trial court. I would reverse and remand for a new trial.

**Motion for New Trial: Standard of Review**

Appellate courts review a trial court's denial of a motion for new trial under an abuse of discretion standard, reversing it only if it was clearly erroneous and arbitrary. *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012). The trial court's denial of the motion is arbitrary if no reasonable view of the evidence could support the ruling. *Id.* This standard requires that the appellate court review the evidence in the light most favorable to the trial court's ruling. *Id.* Appellate courts do not substitute their own views for those of the trial court; instead, an appellate court must affirm the ruling of the trial court if it was within the zone of reasonable disagreement. *Id.* "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.*

The same deferential review applies to historical facts. *Id.* The appellate court is free to disbelieve the statements in an affidavit, especially one unsupported

12

by live testimony. *Id.* The Court of Criminal Appeals cited the Rules of Civil Procedure in holding that "affidavits from an interested party may establish a fact for summary-judgment purposes only if that evidence is 'clear, positive and direct, otherwise credible, and free from contradictions and inconsistencies, and could have been readily controverted.'" *Id.* (quoting *Charles v. State*, 146 S.W.3d 204, 210 (Tex. Crim. App. 2004), *superseded in part on other grounds by* TEX. R. APP. P. 21.8(b), *as recognized in State v. Herndon*, 215 S.W.3d 901, 905 n.5 (Tex. Crim. App. 2007)); *see* TEX. R. CIV. P. 166a(c). It further held, "The phrase 'could have been readily controverted' means 'the testimony at issue is of a nature which can be effectively countered by opposing evidence.'" *Id.* By contrast, "[s]tatements in affidavits of interested witnesses concerning their own state of mind are 'uncontrovertible' because 'the mental workings of an individual's mind are matters about which adversaries have no knowledge or ready means of confirming or controverting.'" *Id.* The trial court has discretion to disregard statements in an affidavit that do not meet this test. *Id.*; *Charles*, 146 S.W.3d at 210.

## Ineffective Assistance of Counsel

Lopez argues in two issues that his trial counsel's representation was constitutionally defective and deprived him of a fair trial. Legal assistance that is ineffective in preserving the fairness of a trial does not satisfy the mandate of the

Sixth Amendment. *Mickens v. Taylor*, 535 U.S. 162, 166, 122 S. Ct. 1237, 1240 (2002); *Strickland v. Washington*, 466 U.S. 668, 685–86, 104 S. Ct. 2052, 2063 (1984). This Sixth Amendment protection extends to defendants who have retained counsel as well as those who have appointed counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344–45, 100 S. Ct. 1708, 1716 (1980).

Texas adopted the *Strickland* standard in *Hernandez v. State*. 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); *see Riley*, 378 S.W.3d at 456 n.5. Under that standard, "[i]t is the role of the court of appeals . . . to determine whether any reasonable view of the record, viewed in the light most favorable to the trial court's ruling, could support the trial court's implicit findings." *Riley*, 378 S.W.3d at 459. As a general rule, a defendant alleging a Sixth Amendment violation must demonstrate not only (1) representation falling below an objective standard of representation under prevailing professional norms but also (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 687, 694, 104 S. Ct. at 2064, 2068; *see Mickens*, 535 U.S. at 166, 122 S. Ct. at 1240. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Riley*, 378 S.W.3d at 458.

**A. First Prong of *Strickland*: Counsel's Unprofessional Errors**

14

Lopez argues that Hecker's representation was constitutionally defective on three grounds: (1) Hecker failed to do the reasonable investigation that was necessary for him to represent Lopez professionally; (2) Hecker's previous representation of Johnson created a conflict of interest that prevented Hecker from representing Lopez adequately, as shown by specific instances in the record; and (3) Hecker erroneously advised Lopez that he should plead guilty to murder without an agreed recommendation on punishment as the only way to avoid both jail time and conviction for a felony. I agree with Lopez that Hecker's representation was constitutionally defective because of each of these errors.

### 1. Hecker's Constitutionally Inadequate Investigation and Failure to Investigate and Introduce Mitigating and Rebuttal Evidence on Lopez's Behalf

Lopez contends that Hecker failed to conduct a constitutionally adequate investigation of the facts of his case and that the failure to investigate, together with the coerced guilty plea, prejudiced the outcome of the case such that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. I agree with Lopez.

Under the Sixth Amendment, "counsel has a duty to make reasonable investigations," and "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is

15

reasonable. . . ." *Id.* at 688, 690–91, 104 S. Ct. at 2065–66; *see Wiggins v. Smith*, 539 U.S. 510, 521–22, 123 S. Ct. 2527, 2535–36 (2003). Put otherwise, counsel has an obligation to become acquainted with the facts of the case and conduct a reasonable investigation. *See Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066; *Ex parte Lilly*, 656 S.W.2d 490, 493 (Tex. Crim. App. 1983) ("It is fundamental that an attorney must have a firm command of the facts of the case as well as the law before he can render reasonably effective assistance of counsel."); *Ex parte Ewing*, 570 S.W.2d 941, 947 (Tex. Crim. App. 1978) (holding that counsel has duty to make independent investigation of facts surrounding allegations against his client). "A natural consequence of this notion is that counsel also has a responsibility to seek out and interview potential witnesses and failure to do so is to be ineffective, if not incompetent, where the result is that any viable defense available to the accused is not advanced." *Ex parte Lilly*, 656 S.W.2d at 493.

Where counsel has decided not to introduce mitigating evidence we determine whether the investigation supporting that decision "*was itself reasonable.*" *Wiggins*, 539 U.S. at 523, 123 S. Ct. at 2536 (citing *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066) (emphasis in *Wiggins*). "[I]nvestigations into mitigating evidence 'should comprise efforts to discover *all reasonably available mitigating evidence* and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Id.* at 524, 123 S. Ct. at 2537 (quoting ABA

16

Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)) (emphasis added in *Wiggins*). An investigation into mitigating circumstances is unreasonable when counsel abandons his investigation after having acquired only rudimentary knowledge of relevant facts when evidence regarding relevant facts is actually available. *See id.* at 524–25, 123 S. Ct. at 2537. "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527, 123 S. Ct. at 2538. "'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Id.* at 533, 123 S. Ct. at 2541 (quoting *Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066).

Here, Hecker appeared as Lopez's attorney on November 12, 2010, a full year before trial. An assistant district attorney faxed Hecker a letter on October 6, 2011, advising him of her office's open-file policy and expressing concern that Hecker might not at that time have obtained a copy of Lopez's statement contained in the State's files. The assistant district attorney filed her letter with the trial court the following day. On November 14, 2011—the same day Lopez entered a plea of guilty on Hecker's advice—Hecker executed a confidentiality agreement with the District Attorney's office that was necessary for him to obtain access to Lopez's

17

statement. In other words, the record conclusively shows that, although he appeared in the case a year before trial, Hecker took no steps to obtain the State's files containing Lopez's statement about the facts and the surveillance video of the incident until the day he advised Lopez to plead guilty.

Despite Hecker's opportunity to provide facts regarding his investigation in his affidavit, there is no evidence in the record that Hecker at any point took the next step of actually obtaining the State's file and verifying whatever facts Lopez told him. Rather, the record shows that Hecker did not introduce at trial any of the evidence in the file favorable to Lopez, including photos of Lopez's injuries; photos of the interior of Ford's car showing a gun and a bottle of vodka; Ford's autopsy report showing alcohol and the principal metabolite of cocaine in his system; and photos showing the bullet entering above the rear bumper of Ford's car. Nor did Hecker refresh Lopez's memory by showing him the video and his statement so that he could rebut the State's characterization of events. Nor did he obtain and introduce Johnson's and Ford's criminal records or internet photos of Ford wearing a red bandana and sporting apparent gang signs. Nor did he seek to impeach or rebut any of the narrative testimony favorable to Ford and Johnson that he elicited from Ford's aunt and sister, Johnson's wife, with any of the evidence of Ford's and Johnson's prior bad acts.

18

The *only* evidence that Hecker did any investigation whatsoever is his own self-serving and conclusory statement in his affidavit that he received all of the State's evidence well in advance of Lopez's plea. However, this self-serving and conclusory statement was readily controverted by all of the other evidence. *See Riley*, 378 S.W.3d at 457. The trial court had discretion to disregard statements in Hecker's affidavit—and any of the other affidavits, including Lopez's unsworn declaration—that were not "clear, positive and direct, otherwise credible, and free from contradictions and inconsistencies, and could have been readily controverted." *See id.* This appellate court must defer to the trial court's ruling to the extent it is supported by a reasonable view of the evidence. *See id.* But, like the trial court, this court may not disregard evidence that is clear, direct, and easily controvertible, as Lopez's statements were. *See id.*

Lopez testified in his declaration that "Mr. Hecker never discussed self-defense, defense of a third person, or the state's requirement to prove 'intent' as an element of Murder," even though, as I discuss below, the facts plainly supported the availability of these defenses to Lopez and the potential for the State's being unable to prove the intent element of murder—any of which, if found by a jury in Lopez's favor, could have resulted in Lopez's acquittal or conviction for a lesser-included offense. And, again, Hecker's affidavit confirms that "[t]he primary reason that the client did not want to have a jury trial in this case was that if a jury

19

gave him adult probation it would be a conviction and his only chance to avoid a conviction was a not guilty from a jury trial or deferred adjudication probation from the Court."

In short, the primary reason that Lopez pled guilty to murder was that his attorney urged him to do so (1) on a false promise that a plea of guilty to murder was his only path to deferred adjudication and avoidance of a felony on his record, and (2) on an unfavorable presentation of the facts that effectively denied the availability of any defenses. Hecker gave Lopez this advice without having obtained and reviewed with Lopez either the surveillance video or Lopez's statement. Thus, he advised Lopez that his complete defense of self-defense would not succeed, that the penalty for manslaughter would be worse than that for murder, and that he should waive a jury trial. Specifically, Hecker averred that Lopez "selected the plea to the Court after I thoroughly went over the facts of this case, which included a scene video of the fight between the Defendant and the deceased Complainant and the shooting by the Defendant after he moved his vehicle and the deceased Complainant had also driven off." Lopez, however, disputed this version of the facts after he reviewed his statement and the video—which, he testified by affidavit, showed Ford's car starting to reverse before Lopez fired at it and struck it from behind, contrary to the State's representation at the punishment hearing.

20

Hecker also averred, "The basis for his defense that he was acting in self-defense, having been beaten by the deceased Complainant and a friend, could have failed due to the time lapse between the fight and the possible removal of the threat being posed by the Complainant at the time the Defendant elected to fire the weapon." Yet time-lapse notations in the video actually showed that only twenty-four seconds elapsed between the time Lopez retrieved his gun, after Ford started to reverse his car into the path of Lopez's retreating vehicle, and the time Lopez fired at Ford's vehicle. So Hecker's affidavit actually shows that he pre-judged the facts adversely to his client without showing him either the video or his statement and without getting the client's account of events and that he advised his client, accordingly, to reject defenses and lesser-included offenses that could reasonably have been found in Lopez's favor.

Finally, Hecker averred, "I also explained to him that if in fact the jury convicted him of the lesser-included offense of manslaughter and they gave him probation for 2-10 years or penitentiary time for 2-20 years there would still be a final felony conviction. Again, he elected to plead guilty as it was the only possibility under the facts in this case to avoid going to prison as well as avoid a felony conviction."

Despite the fact that the trial court heard only facts adverse to Lopez at the PSI hearing, the court nevertheless sentenced Lopez to only eighteen years on a

21

plea of murder, and it subsequently granted a new trial on punishment and reduced Lopez's sentence to fifteen years following the hearing on the motion for new trial. The historical facts, supplemented by the new evidence presented at the motion for new trial, must be taken to support the new trial on punishment granted by the trial court. *See Riley*, 378 S.W.3d at 457 ("[D]eferential review requires the appellate court to view the evidence in the light most favorable to the trial court's ruling."). The only remaining question is whether the trial court clearly erred in failing to grant Lopez a new trial on guilt in light of the prejudicial and unprofessional account of the law and the facts given to Lopez by his counsel to induce his plea. *See id.*

I conclude that no reasonable finder of fact could credit Hecker's actions as reasonable trial strategy, precluding the trial court from granting Lopez a new trial. *See id.* at 459 ("It is the role of the court of appeals . . . to determine whether any reasonable view of the record, viewed in the light most favorable to the trial court's ruling, could support the trial court's implicit findings."). Rather, Hecker's investigation was objectively unreasonable and, therefore, constitutionally defective. *See Wiggins*, 539 U.S. at 523, 123 S. Ct. at 2536; *Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066; *Ex parte Lilly*, 656 S.W.2d at 493.

I would hold that, even in the absence of other errors, the first prong of *Strickland*—unprofessional errors by counsel—is established by Hecker's

22

constitutionally inadequate investigation and its results. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

### 2. Counsel's Conflict of Interest

Lopez also argues that Hecker's prior representation of Johnson—who was Ford's brother-in-law and who participated in the assault against Lopez on the day in question—adversely affected Hecker's ability to represent him and deprived him of a fair trial. I agree with Lopez that his counsel's conflict of interest prevented his counsel from conducting a proper investigation, presenting arguments favorable to Lopez, and advancing plausible arguments damaging to Ford and Johnson, a conflict which is manifested in the record. Therefore, I would hold that Hecker's representation of Lopez was unprofessional on this ground as well.

The Texas Court of Criminal Appeals has held that the proper standard by which to analyze claims of ineffective assistance of counsel on grounds of conflict of interest is the *Cuyler v. Sullivan* standard. *Acosta v. State*, 233 S.W.3d 349, 356 (Tex. Crim. App. 2007) (citing *Cuyler*, 446 U.S. at 349–50, 100 S. Ct. at 1719). Under this standard, the defendant must show (1) that his trial counsel had an actual conflict of interest and (2) that the conflict actually colored his counsel's actions during trial. *Id.* Stated differently, "[T]he appellant must show that an actual conflict of interest existed and that trial counsel actually acted on behalf of those other interests during the trial." *Id.* at 355. The conflict of interest must

23

manifest itself in specific instances of counsel's performance. *Pina v. State*, 127 S.W.3d 68, 72 (Tex. App.—Houston [1st Dist.] 2003, no pet.). "[A]n actual and sufficient conflict of interest exists when one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing." *Id.* (quoting *Ferguson v. State*, 639 S.W.2d 307, 310 (Tex. Crim. App. [Panel Op.] 1983)). Counsel is constitutionally ineffective due to a conflict of interest when "an attorney is unable to cross-examine, or is chilled in the cross-examination of, a government witness because of the attorney/client privilege arising from counsel's prior representation of the witness or from his duty to advance the interest of the witness as a current client." *Ramirez v. State*, 13 S.W.3d 482, 487 (Tex. App.—Corpus Christi 2000, pet. dism'd).

Here, the record contains numerous specific instances of inadequate representation demonstrating Hecker's conflict of interest. These include Hecker's deficient cross-examination of Ford's aunt and of Johnson's wife during the first punishment hearing, in which he elicited testimony beneficial to the State's case against his client, Lopez—including testimony that neither Ford nor Johnson was associated with a gang, that Ford was a peaceful individual, that Ford's and Johnson's assault on Lopez was not within their normal character, and that they had good employment histories. They also included Hecker's failure to impeach

24

these witnesses with Johnson's previous convictions, including a conviction for aggravated robbery with a deadly weapon, which supported Lopez's case that these were violent individuals and that he was justified in shooting at Ford's car in self-defense or in defense of another.[1]

Hecker's performance presents a scenario similar to that in *Ramirez*, in which the defense attorney was unable to cross-examine a witness because of a conflict of interest. *See Ramirez*, 13 S.W.3d at 487. Therefore, applying *Cuyler*, *Acosta*, and *Ramirez*, I conclude that the adverse impact of Hecker's conflict of interest in having represented Johnson in multiple representations on criminal matters clearly manifested itself in the record, satisfying the standard of proof required by those cases for Hecker to be found to have been constitutionally ineffective as Lopez's counsel due to a conflict of interest. *See Cuyler*, 446 U.S. at 349–50, 100 S. Ct. at 1719; *Acosta*, 233 S.W.3d at 356.

### 3. Counsel's Advice that Lopez Plead Guilty to Murder

Finally, as the principal thrust of his first issue, Lopez contends that Hecker's advice that he plead guilty to murder as the only way to avoid conviction

---

[1] *See* TEX. R. EVID. 404(a)(2); *Torres v. State*, 71 S.W. 3d 758, 760–61 (Tex. Crim. App. 2002) ("A defendant in a homicide prosecution who raises the issue of self-defense may introduce evidence of the deceased's violent character. The defendant may offer opinion or reputation testimony to prove the deceased acted in conformity with his violent nature. Specific, violent acts of misconduct may be admitted to show the reasonableness of the defendant's fear of danger, or to show that the deceased was the first aggressor.") (internal citations omitted).

25

and jail time under the circumstances of this case was clearly erroneous and clearly prejudicial and reflected constitutionally inadequate representation. Again, I agree with Lopez.

A guilty plea entered after a proper demonstration of ineffective assistance of counsel is considered involuntary and therefore invalid. *Ex parte Moody*, 991 S.W.2d 856, 857–58 (Tex. Crim. App. 1999); *Ex parte Battle*, 817 S.W.2d 81, 82 (Tex. Crim. App. 1991) ("A defendant's election to plead guilty or nolo contendere when based upon erroneous advice of counsel is not done voluntarily and knowingly."). The Court of Criminal Appeals has held that erroneous advice regarding eligibility for probation satisfies the first prong of *Strickland. Riley*, 378 S.W.3d at 458.

Here, at the hearing on Lopez's motion for new trial, Lopez introduced his own unsworn declaration stating, "Mr. Hecker told me that if I went to the judge for a PSI hearing the Judge was going to give me probation. He told me that I had two options: 1) go to trial and risk going to jail, or 2) plead guilty to a PSI and get probation, but that if I was going to plead 'guilty' that I should do so quickly because the Judge might change her mind about giving me probation." This testimony was corroborated by affidavits from Lopez's mother, godmother, and fiancée. Lopez's mother testified, "From the beginning of his representation, Mr. Hecker told my son that he was going to try to get the case dismissed and assured

26

me my son would not go to jail. He told John and I in front of Victoria Izquierdo and Murita McKellery that the Judge was going to give him probation at the hearing. Don Hecker said he was friends with the Judge." Lopez stated, "I did not know that the law did not allow the Judge to give me probation if I pled guilty to Murder. My attorney never discussed receiving deferred adjudication." He stated, "I would not have pled guilty and waived a jury trial but for my attorney telling me that I would receive probation."

Hecker, likewise, testified by affidavit. He stated that he approached the judge and asked her whether she would be able to consider probation in the case. He further testified that he "urged the Court that this case was at worst a case of sudden passion," and the judge told him that she would consider probation. He then reported to Lopez "that if he entered a plea of guilty the Judge could sentence him to 5 to 99 years or life or 5 to 10 years deferred adjudication probation" and "that there was absolutely no way anyone could predict which of these alternatives the Judge would select in this case."

Taking Hecker at his word that he told the judge "this case was at worst a case of sudden passion," his advice to Lopez to plead guilty to murder was constitutionally unprofessional. "Sudden passion" is second-degree murder and, like first-degree murder, is also charged under Penal Code section 19.02. *See* TEX. PENAL CODE ANN. § 19.02(a)(2),(d) (Vernon 2011). Proof of sudden passion at the

punishment stage of trial reduces the offense of murder to a second-degree felony. *Id.* But Hecker both failed to advise Lopez on second-degree murder and failed to put on the evidence in Lopez's favor that could have reduced the charge to the second-degree felony murder. He likewise failed to consider and advise Lopez of the fact that the State would have to prove Lopez's intent to murder to obtain a murder conviction. Nor did he advise Lopez of the availability of other lesser-included offenses, such as manslaughter or criminally negligent homicide. Hecker also failed to consider and improperly advised Lopez on the availability of the defenses of self-defense and defense of a third person. This deficient advice was compounded by Hecker's failure to present any of the mitigating evidence favoring Lopez or to present any evidence establishing Lopez's entitlement to conviction on a lesser-included offense or to acquittal based upon the lack of intent to murder or on the defenses of self-defense or defense of a third person.

By having Lopez plead guilty to first-degree murder, as he did, Hecker foreclosed the possibility that Lopez could present evidence that he acted with sudden passion or that he did not intend to kill Ford, or another, and did not anticipate that human life would be taken. Hecker's deficient advice likewise foreclosed the availability of the defenses of self-defense and defense of a third person. Hecker's deficient advice failed to inform Lopez of the possibility that Lopez could have bargained for a plea to a lesser-included offense, such as

28

criminally negligent homicide, manslaughter, or sudden passion, all of which were available to him under the circumstances of this case. [2] It likewise foreclosed the possibility of Lopez's seeking a jury charge on these lesser-included offenses or on the complete defenses of self-defense or defense of a third person. Instead, as demonstrated by Hecker's own affidavit testimony, Hecker did not challenge the time frame the State presented by the time-lapsed video evidence available to him to support a claim of sudden passion. He also erroneously informed Lopez that the lesser-included offenses and defenses were not available, in spite of affirmative evidence in the record showing that they *were* available to him. Hecker's advice also deprived Lopez of his right to a jury trial with a charge instructing the jury

---

[2]    *See* TEX. PENAL CODE ANN. §§ 9.31 (self-defense); 9.33 (defense of third person); 19.02(a)(2),(d) (sudden passion or second-degree murder); 19.04 (manslaughter); 19.05 (criminally negligent homicide) (Vernon 2011); *see also Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011) (holding that, if offense is lesser included of charged offense and there is scintilla of evidence supporting conviction only for lesser offense, defendant is entitled to have lesser-included offense submitted to jury); *Cardenas v. State*, 30 S.W.3d 384, 392–93 (Tex. Crim. App. 2000) (setting out criminally negligent homicide and manslaughter as lesser-included offenses of murder with reduced mens rea requirements); *Hamel v. State*, 916 S.W.2d 491, 494 (Tex. Crim. App. 1996) (holding that, where defendant was entitled to instruction on self-defense, he was also entitled to instruction on defense of third person where defendant testified he believed his use of deadly force was necessary to protect his own life and that of his father); *Frank v. State*, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985) ("[A] defendant is entitled to a charge on the right of self-defense against multiple assailants if 'there is evidence, viewed from the accused's standpoint, that he was in danger of an unlawful attack or a threatened attack at the hands of more than one assailant.'") (quoting *Wilson v. State*, 145 S.W.2d 890, 893 (Tex. Crim. App. 1940)).

that the State had the burden of proving intent beyond a reasonable doubt to convict Lopez of murder.

A criminal defendant has a constitutional right under the due process clause of the Fourteenth Amendment to present a valid defense. *Chambers v. Mississipppi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 1045 (1973). Hecker's erroneous advice directly foreclosed any possibility of the deferred adjudication that he had held out to Lopez to induce his guilty plea—as well as any possibility of a reduced sentence on sudden passion, manslaughter, or criminally negligent homicide, and any possibility of Lopez's acquittal on grounds of self-defense or defense of a third person.

I would hold that Lopez's plea of guilty was involuntary and therefore invalid and that Hecker's advice was unprofessional, in satisfaction of the first prong of *Strickland*. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Riley*, 378 S.W.3d at 458 (concluding that erroneous advice regarding availability of probation satisfied first prong of *Strickland*). I would also hold that, because Hecker's erroneous advice caused Lopez to waive his best options for a more favorable outcome, the second prong of *Strickland* was satisfied *if* the record at the motion for new trial hearing not only supported the availability of those defenses and lesser charges to Lopez, but also supported the inference that the outcome of the case would have been different if Hecker had not erroneously advised his client

30

to plead guilty to murder. *See Riley*, 378 S.W.3d at 458 (holding that "counsel's performance in giving incorrect advice regarding probation was deficient," so that appellant had "met his burden under the first prong of *Strickland*," but that analysis of "the prejudice prong turns on whether the deficiency made any difference to the outcome of the case"). I, therefore, turn to the second prong of *Strickland*.

## B. Second Prong of *Strickland*: Prejudice

To prove constitutionally ineffective assistance of counsel, a criminal defendant must ordinarily prove not only unprofessional errors of counsel but also "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *see Mickens*, 535 U.S. at 166, 122 S. Ct. at 1240.

For an inadequate investigation to constitute a Sixth Amendment violation, as Lopez has alleged here, an appellant must show that his counsel's failures prejudiced his defense. *Wiggins*, 539 U.S. at 534, 123 S. Ct. at 2542 (citing *Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067). In assessing prejudice, the appellate courts "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id.* The appellate court must determine whether there is a reasonable probability that a reasonably competent attorney, aware of the evidence, would have introduced it in an admissible form and whether there is a reasonable probability that a fact finder confronted with the mitigating evidence

31

would have returned a different verdict or sentence. *See id.* at 535–36, 123 S. Ct. at 2542–43.

Likewise, when an attorney has given incorrect advice regarding how his client should plead, there must be a reasonable probability that but for the erroneous advice the outcome of the case would have been different. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Riley*, 378 S.W.3d at 458.

However, there is an exception to the general rule that plaintiffs must prove the second prong of *Strickland*—namely, when assistance of counsel has been denied at a critical stage of the proceeding, including those cases in which the defendant's attorney actively represented conflicting interests. *See Mickens*, 535 U.S. at 166, 122 S. Ct. at 1240–41. In those cases, the defendant must establish that the conflict of interest actually adversely affected his counsel's performance, but he need not establish that the result of the proceedings would have been different but for counsel's unprofessional errors. *Id.* at 170–73, 122 S. Ct. at 1243–44. In other words, he need not prove the second prong of *Strickland* so long as he establishes that the conflict of interest actually adversely affected his counsel's performance.

In this case, I would conclude that Lopez established that Hecker's conflict of interest was at least in part responsible for Hecker's failure to conduct a constitutionally adequate investigation, for his failure to present Lopez's case at

trial, and, arguably for his urging Lopez to plead guilty to murder. However, I would find it unnecessary to decide whether the conflict of interest rose to the level in which proof of the second prong of *Strickland* is unnecessary because the cumulative effect of counsel's errors clearly establishes *Strickland*'s second prong,

When counsel's actions have deprived his client of his Fourteenth Amendment right to present a valid defense, the representation clearly creates a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different. *See Chambers*, 410 U.S. at 294, 93 S. Ct. at 1045 (recognizing constitutional right to present valid defense); *Riley*, 378 S.W.3d at 458 (holding that "the prejudice prong turns on whether the deficiency made any difference to the outcome of the case"). Likewise, when trial counsel fails to conduct a constitutionally adequate investigation and, as a result, fails to put on mitigating and rebuttal evidence on behalf of his client, the outcome is prejudiced. *See Wiggins*, 539 U.S. at 535–36, 123 S. Ct. at 2542–43.

I would hold that prejudice under the second prong of *Strickland* was clearly proved by the preponderance of the evidence in this case, where Hecker ignored *all* arguably available defenses and lesser-included offenses, which he failed to explain to Lopez or explained away; where facts favorable to those defenses and lesser-included offenses were likewise ignored or explained away; where Hecker failed to procure Lopez's statement, which was in the possession of the State and

33

readily available; where Hecker failed to show Lopez the surveillance video of the incident or interview him about the facts; where there is no evidence that Hecker did any independent investigation into facts material to elements of the offense with which Lopez was charged and the defenses he might claim; where Hecker failed to call an investigating police officer, whose proposed testimony was favorable to Lopez, to testify; where Hecker failed to introduce evidence of the criminal records and gang affiliations of Lopez's assailants, but instead actively solicited testimony regarding their good character; where Hecker failed to introduce photographs of the gun and alcohol in the assailants' car; where Hecker failed to procure or introduce the available photographs of the injuries Lopez sustained in the attack leading up to Ford's death; where Hecker failed to introduce photographs showing the bullet entering Ford's car just above the rear bumper and traveling through two rows of seats to reach Ford; and where Hecker urged Lopez to plead guilty to murder on the erroneous advice that *only in that way* could he receive deferred adjudication and that he had no viable defense for self-defense and could not receive such a favorable outcome on a charge of manslaughter, while defense of a third person or criminally negligent homicide were never mentioned as a possible defense or lesser-included offense.

Not only did Hecker fail to conduct a constitutionally adequate investigation and to introduce rebuttal evidence and mitigating evidence favorable to Lopez's

34

interests—including testimony regarding the video of the incident, the photographs of Lopez's injuries, the photograph of the bullet hole just above the rear bumper of Ford's car, photographs of the alcohol and gun in Ford's car, testimony regarding Ford's statement that he was a member of the Bloods, and the photographs from the internet of Ford displaying what appeared to be gang signs—he actively elicited lengthy narrative testimony favorable to Johnson and Ford from Johnson's wife and Ford's aunt, while failing to cross-examine those witnesses on Johnson's and Ford's violent pasts. He also failed to introduce evidence of the short time lapse between the end of Lopez's beating at Ford's and Johnson's hands and Lopez's shot at the back of Ford's car that could have supported a charge of sudden passion or other lesser-included offenses. These acts and omissions were clearly prejudicial to Lopez under the circumstances of this case, since critical evidence in support of Lopez's interests was omitted while evidence adverse to Lopez's interests was left unrebutted or actively solicited.

Under *Strickland,* counsel has an obligation to become acquainted with the facts of the case and to conduct a reasonable investigation. *See Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2065–66; *Ex parte Lilly*, 656 S.W.2d at 493 (stating that attorney must have firm command of facts of case as well as law to render reasonably effective assistance). I would hold that the "strategy" evinced by Hecker's acts and omissions was unreasonable as a matter of law and prejudiced

35

Lopez's defense, satisfying the second prong of *Strickland*. *See Wiggins*, 539 U.S. at 535–36, 123 S. Ct. at 2542–43; *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

Given Hecker's advice to Lopez regarding the advisability of waiving a jury, the unavailability of self-defense or defense of a third person under the facts, the inadvisability of pleading sudden passion or manslaughter, and Hecker's failure to advise Lopez of the necessity of the State's proving the element of intent to secure a conviction for murder, together with the favorable evidence Hecker failed to introduce at trial and the adverse evidence he elicited and failed to rebut, I would also hold that, had Hecker properly advised Lopez of his rights and the law, there is a reasonable probability that the result of the proceedings against him would have been different. *See Riley*, 378 S.W.3d at 460. Therefore, I would hold that Lopez satisfied the second prong of *Strickland* for this reason as well. *See* 466 U.S. at 694, 104 S. Ct. at 2068.

Furthermore, as I stated above, based on *Cuyler* and *Acosta*, I would conclude that the adverse impact of Hecker's conflict of interest in having represented an adverse party, Johnson, in multiple representations on criminal matters clearly manifested itself in the record, satisfying the standard of proof required by those cases for Lopez to be granted a new trial. *See Cuyler*, 446 U.S. at 349–50, 100 S. Ct. at 1719; *Acosta*, 233 S.W.3d at 356. Thus, when this evidence is considered with the evidence of Hecker's failure to investigate, I would

36

conclude that Lopez was entitled to a new trial, even if he were not so entitled under either theory alone.

I would conclude that Lopez was harmed by entering his involuntary guilty plea, and that, when evidence of Hecker's unprofessional errors and their prejudicial effect on the outcome of Lopez's case was presented to the trial court at the hearing on the motion for new trial, that court clearly erred in failing to grant Lopez a new trial as to guilt or innocence.

I would sustain Lopez's first and second issues.

## Conclusion

I would reverse the judgment of the trial court and remand for a new trial.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Keyes, J., dissenting.

Publish. TEX. R. APP. P. 47.2(a).