

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00443-CR

———————————————

LONNIE LYNBERG JOHNSON JR., Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1513767D

Per Curiam Memorandum Opinion

# MEMORANDUM OPINION

## I. Introduction

A jury convicted Appellant Lonnie Lynberg Johnson Jr. of two counts of possession with intent to deliver a controlled substance that weighed four grams or more but less than two hundred grams. The jury did not find that Appellant had exhibited a deadly weapon during the commission of the offense. The trial court assessed punishment on each count at fifty-five years' incarceration in the Institutional Division of the Texas Department of Criminal Justice and ordered the sentences to run concurrently.

Appellant raises two points on appeal. First, he asserts that the evidence is insufficient to establish that he had possession of the controlled substances. We overrule this point because when viewed in the light most favorable to the convictions, the record contains evidence that supports a reasonable inference that Appellant was linked to the controlled substances and that supports a finding that he possessed them.

Second, Appellant contends that his trial counsel operated with a conflict of interest that caused him to render ineffective assistance of counsel. We overrule this point because Appellant's trial counsel had no actual conflict of interest, and even if he did, he did not advance another interest to the detriment of Appellant.

We affirm.

## II.  Appellant's argument—that there is insufficient evidence that he "possessed" controlled substances—fails.

In his first point, Appellant contends that the record does not establish enough links to place him in possession of the narcotics that were found inside bags in a vehicle in which he was riding.  The court of criminal appeals lists numerous nonexclusive factors that guide the determination of whether there is sufficient evidence of possession.  But this assortment of factors collapses into a single question:  does the record contain evidence from which the jury could have drawn a reasonable inference that Appellant was in possession of the controlled substances that were found in the vehicle?  Here, the jury watched the videos from the arresting officers' body cameras and saw Appellant use the presence of his children in the vehicle in an attempt to remove from the vehicle one of the bags containing the narcotics and then later deny that he had done so.  Appellant also used the presence of other bags belonging to his children as an attempt to dissuade the officers from searching what turned out to be narcotics-containing bags located in the vehicle.  Appellant's efforts to conceal the contents of the bags containing the narcotics and other evidence outlined below support the reasonable inference that Appellant indeed possessed the drugs concealed in those bags.

### A.  The factual background of the discovery of a cache of drugs following a traffic stop of a stolen vehicle without its headlights illuminated

After nine o'clock on a September night, a sport utility vehicle (SUV) without its headlights on passed a police officer.  The officer stopped the vehicle.  Appellant's

3

wife was driving, Appellant was in the passenger seat, and his three children—ranging in age from four to nine—were in the backseat.

The vehicle had paper tags. As the investigating officer routinely did, he compared the Vehicle Identification Number (VIN) on the vehicle with that contained on the tag. The numbers did not match, which usually indicates that the paper tag is a fake. A computer check of the VIN that was listed on the vehicle confirmed that it was stolen.

At that point, the matter became a felony stop. Because of the presence of the children in the vehicle, neither the investigating officer nor a backup officer who had also arrived followed the standard procedure of removing all of the occupants from the vehicle at gunpoint. Instead, the investigating officer who originally stopped the vehicle asked the driver to step from the car, cuffed her out of the children's sight, and placed her in his patrol car.

But because all occupants must be removed from the vehicle during a felony stop, the officers asked Appellant to get out of the vehicle, which he did. Initially, Appellant was cooperative with officers, though he and his wife protested that they did not know that the vehicle was stolen.

On the video generated by the investigating officer's body camera, he told Appellant's wife that when he ran the VIN, the computer showed that the vehicle had been stolen out of Fort Worth. She responded, "Stolen?" In response to a question asking Appellant's wife from whom the vehicle was bought, she said that it was

4

bought from a friend, that she had not had it long, and that she could let the officer talk to "them."  Appellant said that this was his friend's car and that he did not know that it was stolen.  The backup officer's body camera captured Appellant's statement when he was told that the vehicle was stolen:  "That's ludicrous; I had no clue about nothing like that."  The backup officer requested that Appellant provide the name of the friend who allegedly owned the SUV, and Appellant did so.

As the stop progressed, the backup officer's body camera showed that the officer approached Appellant while he appeared to be removing items from the vehicle and told him that before he started "gathering stuff up," the vehicle must be searched.  Appellant responded, "We ain't got nothing illegal . . . .  What would you think that we have illegal?"  Appellant then relented in his efforts to remove items from the vehicle.

The older children also got out of the vehicle.  The youngest child, who was in the middle of the backseat, was asleep.  Though it was another failure to follow the procedures required for a felony stop, the officers asked Appellant to unbuckle the child's seatbelt and to remove him from the vehicle so that they would not traumatize the child.

While in the process of removing the youngest child from the car, Appellant reached for a camouflage backpack that was sitting immediately next to the child.  That backpack became the central player in the underlying case.  The investigating

officer who made the stop told Appellant to leave the backpack alone and said that no items were to be removed from the vehicle until police had searched them.[1]

The officers' refusal to let Appellant have access to the camouflage backpack caused a change in Appellant's attitude, and in the investigating officer's words, Appellant became upset and argumentative. According to the officers, Appellant indicated that the backpack belonged to his children and that he did not give his permission to look in it. The officers assured Appellant that after police had searched the backpack and the other bags in the vehicle, the officers would give the bags to Appellant if there was nothing illegal in them.

The backup officer also described how Appellant's attitude changed when he learned that the vehicle's contents would be searched. This officer reiterated Appellant's statement that he did not want the children's bags searched.

A search of the camouflage backpack revealed that it contained a green leafy substance that appeared to be marijuana; a substance that appeared to be cocaine; and pill bottles, which contained pills but had no prescription labels. The backpack also contained a small scale, rubber gloves, and plastic baggies. One of the officers testified that these items indicate that the person possessing them is a drug dealer.

---

[1]Also on body camera video, the investigating officer told Appellant to leave an item "here" and that the officer would bring it to him. Appellant said, "I can't let you go through my kids' bags." Later, Appellant asked, "Why you gotta go through my kids' stuff?"

Other nondrug-related items were also found in the camouflage backpack. The backpack contained black beads that matched the type of beads that Appellant was wearing in his hair. The backpack also contained a bottle of clipper oil and a clipper attachment for a Wahl clipper, which the officer identified as being used by a barber or someone who cuts hair. Items from a clipper set that matched what was found in the backpack were found in another bag that Appellant had in his seat. Appellant told the officer that he made his living as a barber.

After the search of the backpack revealed its illegal contents, the investigating officer asked Appellant to whom the backpack belonged, and he said that he did not know—though a few moments before he had indicated that it belonged to one of his kids. This officer also testified that this was the same bag that Appellant had tried to grab and had not let the officer look into. One of the body camera videos depicts this officer bringing the camouflage backpack out of the vehicle; showing it to Appellant; and stating, "You said that this was your kids' bag, man." Appellant responded, "No, I didn't say that was my kids' bag." Later, the video captured Appellant again saying that the officers should not search his kids' bags.

The backup officer also noted that before Appellant learned that the vehicle would be searched, Appellant did not say that the vehicle contained items that did not belong to him. In the officer's experience, the shift in attitude from cooperative to uncooperative signaled the possibility that there might be something in the vehicle that the defendant did not want the police to know about.

The officers did not immediately place Appellant under arrest when they discovered the drugs in the camouflage backpack because they did not want the children further traumatized. The officers continued the search of the vehicle by examining bags in the hatch area of the SUV. Appellant had stated that the hatch area contained his children's backpacks. After a search of bags in the hatch area, the officers gave two bags to Appellant's children. The children then left with a friend whom Appellant had called to pick them up.

The hatch area also contained "a black in color Puma Lab bag that had been sitting next to and partially on top of the two [children's] backpacks that were in [that] area." A search of that bag revealed more baggies with green leafy substances that appeared to be marijuana and other baggies and pill bottles that contained pills, which also appeared to be illegal substances. This bag also contained empty baggies, gloves, and a food sealer. The investigating officer testified that, as with the items in the camouflage backpack, the items in the black bag are associated with someone who deals drugs.

In response to an inquiry made early in the stop by the backup officer, Appellant stated that there was not a gun in the vehicle. The officers subsequently found a fully loaded handgun in the vehicle. The gun was found in a purse that had been placed on the floorboard in front of the passenger seat where Appellant had been sitting.

8

The investigating officer admitted on cross-examination that no drugs were found on Appellant's person, that no identification was found in the bags, that the bags were not fingerprinted, and that he did not know who the actual owner of the vehicle was or whether some or all of the vehicle's contents belonged to someone else. The officer later confirmed that criminals seldom acknowledge their criminal conduct or leave identification in bags containing narcotics.

Appellant also had $996 in cash on his person. In the officer's experience, this was an unusually large amount of cash for a person to carry around.[2]

## B. The general standard of review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

---

[2]The remaining portion of the record involves expert testimony about the nature of the substances found and their quantity, as well as expert testimony regarding how the evidence indicates that Appellant had an intent to distribute the drugs. Because of the limited nature of Appellant's sufficiency challenge, we will not catalog this evidence.

## C. The standards for resolving a sufficiency challenge on the issue of whether a defendant was in possession of a controlled substance

Here, Appellant was charged with and convicted of possession with intent to deliver two controlled substances—cocaine and methamphetamine.[3] Section 481.112 of the Texas Health and Safety Code states that "a person commits an offense if the person knowingly . . . possesses with intent to deliver a controlled substance listed in Penalty Group 1" and that "[a]n offense . . . is a felony of the first degree if the amount of the controlled substance to which the offense applies is, by aggregate weight, including adulterants or dilutants, four grams or more but less than 200 grams." Tex. Health & Safety Code Ann. § 481.112(a), (d); *see also Kibble v. State*, 340 S.W.3d 14, 18 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ("To demonstrate possession of cocaine with intent to deliver, the State is required to show that

---

[3]The indictment charged two counts:

DEFENDANT, ON OR ABOUT THE 15TH DAY OF SEPTEMBER 2017, IN THE COUNTY OF TARRANT, STATE OF TEXAS, DID INTENTIONALLY OR KNOWINGLY POSSESS WITH INTENT TO DELIVER A CONTROLLED SUBSTANCE, NAMELY COCAINE, OF FOUR GRAMS OR MORE BUT LESS THAN TWO HUNDRED GRAMS, INCLUDING ANY ADULTERANTS OR DILUTANTS,

COUNT TWO: AND IT IS FURTHER PRESENTED IN AND TO SAID COURT THAT THE DEFENDANT IN THE COUNTY OF TARRANT AND STATE AFORESAID ON OR ABOUT THE 15TH DAY OF SEPTEMBER[] 2017, DID INTENTIONALLY OR KNOWINGLY POSSESS WITH INTENT TO DELIVER A CONTROLLED SUBSTANCE, NAMELY METHAMPHETAMINE, OF FOUR GRAMS OR MORE BUT LESS THAN TWO HUNDRED GRAMS, INCLUDING ANY ADULTERANTS OR DILUTANTS[.]

(1) appellant knowingly or intentionally, (2) possessed, (3) cocaine [or methamphetamine], (4) in an amount of greater than four but less than two hundred grams, (5) with the intent to deliver the cocaine [or methamphetamine].").[4]

The focus of Appellant's sufficiency challenge is whether he possessed the substances. Both the Texas Health and Safety Code and the Texas Penal Code provide the same definition for "possession": "actual care, custody, control, or management." *See* Tex. Health & Safety Code Ann. § 481.002(38); Tex. Penal Code Ann. § 1.07(a)(39). Thus, "[t]o prove unlawful possession of a controlled substance, the State must prove that[] (1) the accused exercised control, management, or care over the substance; and (2) the accused knew the matter possessed was contraband." *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005), *overruled in part on other grounds by Robinson v. State*, 466 S.W.3d 166, 173 & n.32 (Tex. Crim. App. 2015). Appellant does not contend that the evidence is insufficient to prove that he knew the substances were contraband; he limits his attack to the sufficiency of the evidence establishing his control and management of the substances because, in his view, the evidence does not establish the link between him and the drugs that is necessary to prove possession.

---

[4]Appellant does not challenge the intent-to-deliver element of the offenses. Nor does he challenge the expert testimony that the substances were controlled substances or the amount of the substances recovered. Thus, because we are not required to review what Appellant did not brief, we will focus on the element of the offenses for which Appellant claims that there is insufficient evidence. *See, e.g., Burks v. State*, No. PD-0992-15, 2017 WL 3443982, at *1 (Tex. Crim. App. June 28, 2017) (op. on reh'g) (not designated for publication).

A person's "fortuitous proximity" to drugs is not sufficient to establish possession; there must be an affirmative link between the defendant and the substances to establish possession:

> The "affirmative links rule" is designed to protect the innocent bystander from conviction based solely upon his fortuitous proximity to someone else's drugs. This rule simply restates the common-sense notion that a person—such as a father, son, spouse, roommate, or friend—may jointly possess property like a house but not necessarily jointly possess the contraband found in that house. Thus, we have formulated the rule that "[w]hen the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances [that] affirmatively link the accused to the contraband."

*Id.* at 406 (citations omitted).

As with any other element of an offense, the affirmative link may be established by direct or circumstantial evidence. *See Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006) ("However, presence or proximity, when combined with other evidence, either direct or circumstantial (e.g., "links"), may well be sufficient to establish that element beyond a reasonable doubt.").

The courts have formulated a nonexclusive list of factors to examine in determining whether the necessary links exist:

> (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive

12

gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Tate v. State*, 500 S.W.3d 410, 414 (Tex. Crim. App. 2016) (quoting *Evans*, 202 S.W.3d at 162, n.12).

But as the court of criminal appeals notes, "[a]lthough these factors can help guide a court's analysis, ultimately the inquiry remains that set forth in *Jackson*: Based on the combined and cumulative force of the evidence and any reasonable inferences therefrom, was a jury rationally justified in finding guilt beyond a reasonable doubt?" *Id.* (citing *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2789). When analyzing the sufficiency of the evidence supporting the element of possession, we cannot focus our analysis on "each circumstance of guilt in isolation without considering the cumulative force of all of the evidence." *Id.* at 417. Our review based on this cumulative view of the evidence requires that "the logical force of all of the admitted evidence must be considered in the light most favorable to the conviction, meaning that all reasonable inferences from the evidence must be resolved in favor of the jury's guilty verdict." *Id.*

13

**D. The evidence from which the jury could draw a reasonable inference that Appellant was in possession of the controlled substances found in the vehicle**

We perform our review not by going through the list of factors to be examined and mechanically checking off those present and those not present. Instead, we examine the cumulative force of the evidence in the light most favorable to the conviction to determine whether it supports a reasonable inference of possession. It does.

We catalog the evidence supporting the inference as follows:

- Appellant claimed that the vehicle belonged to a friend but did not claim that the items in the vehicle belonged to his friend.

- Appellant initially attempted to remove items from the vehicle until he was stopped by the officers.

- Appellant repeatedly used the fact that the vehicle contained bags belonging to his children in an attempt to persuade the officers not to search the vehicle.

- Appellant attempted to take possession of the camouflage backpack while removing one of the children from the vehicle and apparently would have done so if an officer had not instructed him to leave it in place.

- After receiving the instruction to leave that backpack in place, Appellant told the officers that he could not let them search his kids' bags.

- Later, when shown the camouflage backpack, Appellant claimed that he had never asserted that the backpack belonged to his kids.

14

- The camouflage backpack contained not only narcotics and the means of weighing and packaging them but also personal items that appeared to be connected with Appellant, such as beads similar to those worn in his hair and oil and clippers used by someone in Appellant's line of work.

- The clipper attachment found in the camouflage backpack appeared to be from the same set as the Wahl clipper found in a bag on the same seat of the vehicle where Appellant had been sitting.

- Appellant was in possession of an amount of cash that one of the arresting officers found to be unusually large.[5]

- The black bag found in the back of the vehicle was on top of bags that Appellant had identified as belonging to his children.

- The black bag contained narcotics and other items that were similar to those found in the camouflage backpack.

---

[5]Though the amount of cash here—$996—is not shockingly large, the State cites us to cases in which smaller amounts of cash were found that supported an inference of criminal activity. *See Lester v. State*, No. 02-16-00288-CR, 2018 WL 3763897, at *1, *5 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that $434 in cash was a large amount of cash that, along with other factors, allowed the jury to rationally determine that appellant possessed the methamphetamine found in a motorcycle); *Boone v. State*, No. 02-13-00302-CR, 2014 WL 982354, at *1, *3, *5 & n.10 (Tex. App.—Fort Worth Mar. 13, 2014, no pet.) (mem. op., not designated for publication) (holding same regarding "roughly $666"); *Mohmed v. State*, 977 S.W.2d 624, 626–27 (Tex. App.—Fort Worth 1998, pet. ref'd) (holding same regarding $910).

In summary, Appellant was riding in a vehicle in which controlled substances were found. Appellant initially attempted to persuade the officers not to search the bags in the vehicle by claiming that the bags belonged to his kids and told the officers that he would not permit the bags to be searched. He attempted to casually take possession of one of the bags containing controlled substances and would have done so unless instructed not to do so by one of the officers. He later disavowed that he had previously claimed that this bag belonged to his kids. Not just one, but two types of items were found in the camouflage backpack that appeared to be associated with characteristics specific to Appellant.

With regard to the links that were present, Appellant was in an enclosed space with the controlled substances, thus establishing a link between himself and the illegal items found in the vehicle. He attempted to frustrate an examination of the vehicle's contents both by his words and by his attempt to take physical possession of the backpack that contained narcotics, and a jury could reasonably conclude that he had hoped to place the backpack in the car in which his children would be transported away from the scene without its being searched, thus establishing another link. The contents of the backpack contained items that were tied to Appellant's unique personal characteristics, thus establishing a third link. The black bag was found in the vehicle's storage area in a position that made it appear like it had been placed there at the same time that the children's bags—about which Appellant had such concern— had also been placed in the vehicle, thus establishing a fourth link. The black bag

16

contained items that were similar to those found in the backpack that Appellant had attempted to take control over, thus establishing a fifth link. Appellant had an amount of cash on his person that case law concludes—and the evidence supports— is consistent with the dealing of drugs, thus establishing a link between Appellant's activities and the items associated with the dealing of the drugs that were found in the vehicle. Viewed in the light most favorable to the conviction, the cumulative force of this evidence supports a reasonable inference that Appellant was linked to the controlled substances found in the bags and also supports the jury's determination that he had exercised actual control, custody, or management over those substances.

Appellant wants to sidestep the standard of review and what the full record reveals and instead directs our attention to the various factors that are not supported by the record. First, as noted above, our review is not a mechanical process of determining whether the State or Appellant has checked the most boxes in the list of factors. Second, Appellant cannot succeed by pretermitting the full range of the evidence from review. His narrow portrayal of the record mentions only that (1) he was in a vehicle that coincidentally held hidden drugs, (2) what was found in the bags creates only a speculative link to him because the only items that he chooses to acknowledge—the hair beads—could have belonged to his ex-wife[6] or the actual owner of the vehicle, and (3) the possession of $996 in cash as a large amount is

---

[6]At the time of the trial, Appellant was no longer married to the woman who had been the driver of the SUV on the date of the offenses.

17

"relative and indeterminate." A full and candid portrayal of the record in the light most favorable to the verdict establishes a host of links that Appellant ignores.

We overrule Appellant's first point.

### III. We hold that Appellant's trial counsel did not render ineffective assistance because the alleged conflict of interest was waived and did not impair his ability to cross-examine a witness.

In his second point, Appellant claims that his trial counsel[7] was gripped by the jaws of an ethical vise. One jaw was his duty to represent Appellant without concern for the interests of himself or anyone else. The other was the obligation that he held to a former client—Appellant's ex-wife—not to divulge privileged attorney–client communications. The record shows that counsel never felt the actual squeeze of the vise.

Appellant claims that the alleged conflict came to a head when his ex-wife testified during the punishment phase of the trial and that his counsel could not adequately cross-examine her about her criminal history because to do so would breach the attorney–client privilege. But the basis for the conflict disappeared when the ex-wife waived the attorney–client privilege for communications that she had with her former lawyer, Appellant's trial counsel. Even if we assume that a conflict existed, Appellant's counsel did not act in a way that adversely impacted Appellant. The trial record shows that counsel did question the ex-wife's credibility based on her criminal history. Nothing in the record before us suggests that the ex-wife had committed any

---

[7]All references to counsel refer to Appellant's trial counsel.

other criminal act that counsel did not delve into because of his prior professional relationship with her.

## A. The factual background of the conflict claim and how the witness who allegedly created the claim of conflict waived it

The conflict issue initially arose when counsel reurged a motion for continuance and a motion to withdraw in connection with an attempt to change Appellant's election that the jury, rather than the court, assess his punishment. The motion for continuance had previously been denied, but the judge who originally heard the motion allowed counsel to reurge the motion before the judge who conducted the trial.[8] Counsel told the trial court that he had once represented Appellant's ex-wife on the "same set of cases" as those involving Appellant. Though the representation had lasted about thirty days and had ended eight months before the trial that was about to commence, counsel claimed that he had engaged in attorney–

---

[8]The motion for continuance was filed and initially heard at a pretrial hearing on the Friday preceding the Monday that Appellant's trial commenced. The motion states that Appellant's trial counsel (Jayson Nag) "recently" discovered "a potential [conflict] that prevents him from representing [Appellant] in that a co-defendant that will likely testify against [Appellant] is a former client of Jayson Nag." The motion continues, "The attorney–client privilege still exists between Jayson Nag and this co-defendant. Thus, it would be unethical and severely improper of Jayson Nag to cross-examine this codefendant in open court." The motion also suggests that Appellant's trial strategy might implicate the co-defendant. At the pretrial hearing, counsel stated, "I don't think it would be ethical or proper of me to represent him on these four charges due to that conflict that I have with this potential codefendant that is likely to testify against him due to attorney/client privilege and previous conversations that I've had with that particular codefendant." The motion was denied by the judge who heard the pretrial matters though he noted that it could be reurged before the judge who presided over Appellant's trial.

client communications with the former client. Counsel described his quandary as follows: "[I]f the State intends to call her as a witness in guilt/innocence or punishment, then I have to essentially cross-examine my own former client, which I believe would violate Rule 1.06 and 1.09 of our Texas Rules of Ethics because *I do have confidential attorney–client privileged information*." [Emphasis added.]

Counsel indicated that Appellant had not waived the conflict and that he had told Appellant that he would ask for a continuance so that he could obtain new counsel. Counsel claimed that his client would not talk to him because of the alleged conflict. Yet, counsel also described a conversation with Appellant in which Appellant had recently expressed that he did not want counsel to move forward but instead wanted to hire a new attorney and to pick a new jury and elect to go to them for punishment. Appellant's motion for continuance also stated that Appellant's refusal to communicate with counsel was "unrelated" to an alleged conflict of interest. The trial court responded that it would not reward Appellant's attempts at delay. The trial court also noted that the issue had been raised at a status conference more than thirty days before trial. The court stated at that conference that it had told Appellant that the case was set for trial and that he could hire a new lawyer but that the trial would not be rescheduled.

The State noted that it planned to call the ex-wife only during the punishment phase. In rejoinder to the State's point that the ex-wife had been on the State's witness list for months, counsel reiterated his problem as follows: "The attorney–

client privilege does not die just because you withdraw from representing somebody. *As far as I know, it extends until it's waived by that client*." [Emphasis added.]

The trial court again pointed out that the conflict had existed for months, but counsel and Appellant had lived with it until the eve of trial. But the trial court indicated that it would revisit the issue if the ex-wife were actually called to testify.[9]

The State called the ex-wife to testify during punishment. Counsel again emphasized that the ex-wife had not yet waived the privilege for her communications with counsel. Counsel described the ethical problem that this created for him as follows:

> And so my argument is basically twofold, *that it would destroy the attorney/client privilege between myself and [the ex-wife]*, and I don't think it would be effective of me with Mr. Johnson because I think there is a clear conflict of interest if I am put in the awkward position of cross-examining and questioning one of my own former clients, and so that's my objection. [Emphasis added.]

After counsel articulated his view of the ethical issue, the State notified the trial court that it had reached a plea deal with the ex-wife, and in the following exchange,

---

[9]The trial court did not appear to resolve the conflict issue raised in the motion for continuance based on the tardiness of the motion's filing. But it would have been within the court's discretion to do so. *See, e.g.*, *Suniga v. State*, No. AP-77,041, 2019 WL 1051548, at *3, *5 (Tex. Crim. App. Mar. 6, 2019) (not designated for publication) (op. on reh'g) ("[A] defendant cannot manipulate his constitutional right to counsel in a manner that throws the trial process into disarray. . . . The trial court may also consider the timing of a motion to withdraw based on an alleged conflict in determining whether to grant it."), *petition for cert. filed*, (U.S. June 3, 2019) (No. 18-9564).

the ex-wife stated that she agreed to waive any claim of privilege between herself and Appellant's counsel:

> Q. Okay. Also as part of that, I -- I have spoken with [your present lawyer], and you are willing to waive your privilege as far as it goes to your communications with [Appellant's trial counsel] but not with your communication as to [your present lawyer]; is that correct?
>
> A. Correct.

At this point, counsel made no further argument that he operated under a conflict and instead simply asked for a ruling. The trial court overruled the objection.

The ex-wife testified about Appellant's physical abuse of her, his reputation as a drug dealer, his acquisition of firearms as a felon, his involvement in "shooting up" a bar, and his involvement in gambling.

On cross-examination, counsel obtained various concessions from the ex-wife. He obtained the concession that she had never filled out a police report on her claims of domestic violence. After noting that she was arrested with Appellant, counsel had the ex-wife acknowledge that she had failed to appear in court and had been on the run for three or four months. Counsel also had the ex-wife acknowledge that she knew that there was "dope" in the SUV when she and Appellant were arrested. She further acknowledged that Appellant had experienced a rough childhood and was a good father.

**B.    Appellant does not challenge the thoroughness of the trial court's investigation of the conflict but whether a conflict existed that adversely impacted the representation Appellant received.  For this reason, we will also limit our analysis to the existence of a conflict and whether it had an adverse impact.**

Appellant argues that the trial court erred because it did not recognize the existence of a conflict and that he suffered an adverse effect from that conflict.  This approach skips a step that might have an impact on how we analyze the conflict issue. The court of criminal appeals points us to different paths of analysis depending on whether the conflict issue was brought directly to the trial court's attention or was a matter that should have been apparent to the trial court even if not formally raised. This dichotomy is described as follows:

> When the appellant or his attorney has brought a potential conflict of interest to the attention of the trial court, the Supreme Court has said that the trial court has an obligation to investigate and determine "whether the risk of the conflict of interest is too remote to warrant separate counsel."

> If the appellant and his attorney fail to bring the potential conflict to the attention of the trial court and the appealing defendant relies on the argument that the trial court should have been aware of the conflict, the defendant cannot obtain a reversal on appeal unless he shows that his attorney was operating under an actual conflict of interest that adversely affected counsel's performance.

*Routier v. State*, 112 S.W.3d 554, 581–82 (Tex. Crim. App. 2003) (comparing *Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S. Ct. 1173, 1178–79 (1978), with *Cuyler v. Sullivan*, 446 U.S. 335, 349–50, 100 S. Ct. 1708, 1719 (1980)); *see also Dunn v. State*, 819 S.W.2d 510, 519 (Tex. Crim. App. 1991) ("[O]nce a possible conflict of interest is brought to the

23

trial court's attention by either a pretrial motion or trial objection[, the trial court] has the constitutional obligation to at least take adequate steps to ascertain whether the risk of the conflict of interest is too remote to warrant remedial action." (citing *Holloway*, 435 U.S. at 484, 98 S. Ct. at 1178)).

Here, the motion to withdraw brought the potential conflict to the trial court's attention, but Appellant raises no challenge to the thoroughness with which the trial court investigated the conflict. Instead, he moves directly to the issue of whether an actual conflict existed and whether that conflict had an adverse impact on the representation he received. We assume that Appellant cuts to the chase in recognition that there are only narrow grounds to obtain a reversal based on the nature of the inquiry that the trial court made once the conflict issues were brought to its attention and because most attacks still require proof of a conflict that adversely impacted representation:

> Petitioner's proposed rule of automatic reversal [derived from *Wood v. Georgia*, 450 U.S. 261, 101 S. Ct. 1097 (1981),] when there existed a conflict that did not affect counsel's performance, but the trial judge failed to make the *Sullivan*-mandated inquiry, makes little policy sense. As discussed, the rule applied when the trial judge is not aware of the conflict (and thus not obligated to inquire) is that prejudice will be presumed only if the conflict has significantly affected counsel's performance—thereby rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown. *See Sullivan*, [446 U.S. at 348–49, 100 S. Ct. at 1718–19]. The trial court's awareness of a potential conflict neither renders it more likely that counsel's performance was significantly affected nor in any other way renders the verdict unreliable. *Cf. United States v. Cronic*, 466 U.S. [648,] 662, n.31, 104 S. Ct. [2039, 2049 (1984)]. Nor does the trial judge's failure to make the *Sullivan*-mandated inquiry often make it harder for reviewing courts to determine conflict

24

and effect, particularly since those courts may rely on evidence and testimony whose importance only becomes established at the trial.

*Mickens v. Taylor*, 535 U.S. 162, 172–73, 122 S. Ct. 1237, 1244 (2002); *see also Routier*, 112 S.W.3d at 581–82 (explaining that *Mickens* made clear that the Supreme Court's opinion in *Wood v. Georgia* applying *Cuyler* did not create a rule that the failure to adequately inquire into conflict created a right to automatic reversal in the absence of proof of an actual conflict that adversely affected representation.).

The trial court in this case did not *fail* to inquire into the alleged conflict once it was brought to its attention; instead, the trial court investigated and then allowed what Appellant alleges is a conflict to persist that resulted in Appellant's allegedly receiving ineffective assistance of counsel. In other words, the issue moved beyond the adequacy of the trial court's investigation to whether that inquiry should have prompted a different decision by the trial court—to allow counsel to withdraw. Appellant understandably chooses his appellate battle based on a challenge to the trial court's resolution of the issue rather than on how thoroughly it investigated. This is understandable as Appellant will apparently still bear the burden of establishing an actual conflict that adversely affected his representation even if he could raise some challenge that the trial court had conducted an inquiry but had not done so thoroughly enough. As we explain, Appellant has failed to establish an actual conflict or how a conflict adversely affected his counsel's performance.

**C. The law on conflicts of interest as the basis for an ineffective-assistance-of-counsel claim**

An appellant may rely on a conflict of interest held by his counsel as the basis for an ineffective-assistance claim, but proof of that claim requires a showing of an "actual" conflict of interest and "that the conflict actually colored counsel's actions during trial." *Odelugo v. State*, 443 S.W.3d 131, 136 (Tex. Crim. App. 2014) (quoting *Acosta v. State*, 233 S.W.3d 349, 356 (Tex. Crim. App. 2007), which cited *Cuyler*, 446 U.S. at 348, 100 S. Ct. at 1718). To sustain an ineffective-assistance claim predicated on a conflict of interest, an appellant must show that counsel was placed in the vise of differing loyalties and was compelled to favor one of the interests pressing in on counsel over another. *Id.* ("[A]n 'actual conflict of interest' exists if counsel is required to make a choice between advancing his client's interest in a fair trial or advancing other interests (perhaps counsel's own) to the detriment of his client."). A party making an ineffective-assistance claim predicated on a conflict of interest must establish the existence of the conflict by a preponderance of the evidence. *Id.* at 136–37.

Theorizing about the possibility of conflict will not sustain an appellant's burden; instead, "[a]n appellant must identify specific instances in the record that reflect a choice that counsel made between possible alternative courses of action, such as 'eliciting (or failing to elicit) evidence helpful to one [interest] but harmful to the other.'" *Malek v. State*, Nos. 03-10-00534-CR, 03-10-00535-CR, 2012 WL 370551, at

*7 (Tex. App.—Austin Feb. 1, 2012, pet. ref'd) (mem. op. on reh'g, not designated for publication) (quoting *Lopez v. State*, 358 S.W.3d 691, 694–95 (Tex. App.—San Antonio 2011, pet. ref'd), which cited *Gaston v. State*, 136 S.W.3d 315, 318 (Tex. App.—Houston [1st Dist.] 2004, pet. struck) (op. on reh'g en banc)); *see also Pina v. State*, 127 S.W.3d 68, 72 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("Neither the mere assertion of a conflict of interest nor a showing of a possible conflict of interest will support a claim of ineffective assistance of counsel." (citing *Cuyler*, 446 U.S. at 350, 100 S. Ct. at 1719)). In other words, the appellant must pinpoint that "his trial counsel 'had to forego a strategy in the appellant's trial that counsel would have otherwise pursued if he had not represented [a conflicting interest].'" *Malek*, 2012 WL 370551, at *7 (citing *Routier*, 112 S.W.3d at 586).

**D. No actual conflict of interest arose in this case, and even if one had, Appellant's trial counsel did not advance the interest of one client over another.**

Appellant acknowledges that to carry his burden on his ineffective-assistance-of-counsel claim on an alleged conflict of interest of his counsel, he "must point to specific instances in the record reflecting a choice made by [his counsel] that was harmful to Appellant and beneficial to another party." After noting that his counsel had represented his ex-wife for an offense arising from the same criminal transaction as that for which Appellant was charged, Appellant contends that counsel made a choice favoring the ex-wife because it is "likewise undeniable that notwithstanding the incredibly damaging testimony that [the ex-wife] provided for the State against

27

Appellant, [Appellant's trial counsel] never delved into [the ex-wife's] criminal history in an attempt to impeach her credibility."

Thus, Appellant relies on a conflict allegedly created by his counsel's short-lived and long-since-terminated representation of his ex-wife on the same set of charges for which he was on trial. Though joint representation of clients creates a potential conflict, in and of itself that representation is not sufficient to establish the actual conflict necessary to sustain an ineffective-assistance claim. *See State v. Hart*, 342 S.W.3d 659, 666 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) ("Though the evidence supported the conclusion that the joint representation of the Harts[] created a potential conflict of interest, the evidence was legally insufficient to support a finding that an actual conflict of interest arose."). Nor does the fact that a lawyer had to cross-examine his former client translate into an actual conflict of interest. *See United States v. Olivares*, 786 F.2d 659, 663 (5th Cir. 1986) ("In sum, we hold that 'active representation of conflicting interests' connotes more than merely cross-examining a former client who, at an earlier stage of the case, had also paid a portion of his codefendants' legal fees.").

Appellant's counsel attempted to satisfy the burden of establishing an actual conflict by asserting that he could not effectively cross-examine the ex-wife because he knew things that she had told him while the two were in an attorney–client relationship. The concern expressed by counsel was a valid potential concern.

28

An effective cross-examination carried the risk of breaching the lawyer's duty to maintain the confidences of his former client. *See* Tex. Disciplinary Rules Prof'l Conduct R. 1.05, 1.09, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9). And "[i]t is well-established that a defendant is denied the effective assistance of counsel in those instances where an attorney is unable to cross-examine, or is chilled in the cross-examination of, a government witness because of the attorney/client privilege arising from counsel's prior representation of the witness or from his duty to advance the interests of the witness as a current client." *Ramirez v. State*, 13 S.W.3d 482, 487 (Tex. App.—Corpus Christi 2000), *pet. dism'd, improvidently granted*, 67 S.W.3d 177 (Tex. Crim. App. 2001); *see also Charleston v. State*, 33 S.W.3d 96, 101 (Tex. App.—Texarkana 2000, pet. ref'd) ("Additionally, a defendant is denied effective representation when the attorney is unable to properly cross-examine a witness due to a prior representation of that witness.").

But this valid concern about a potential conflict did not rise to the level of an actual conflict in this case. As was her right to do, the ex-wife waived in open court any claim of privilege that existed between her and Appellant's trial counsel. *See Bailey v. State*, 507 S.W.3d 740, 747 (Tex. Crim. App. 2016) ("[Texas Rule of Evidence] 511(1) specifies that a person on whom the rules confer a privilege against disclosure waives the privilege if the person voluntarily discloses or consents to disclosure of any significant part of the privileged matter, unless such disclosure itself is privileged.").

Thus, we are not persuaded that the potential for a conflict in this case blossomed into an actual conflict when the very basis for the actual conflict was removed by the waiver. The waiver removed counsel from the vise of having to decide whether to favor the interests of one client over the other. *See Grimaldo v. State*, No. 13-12-00513-CR, 2013 WL 3517600, at *6 (Tex. App.—Corpus Christi–Edinburg July 11, 2013, no pet.) (mem. op., not designated for publication) (stating that when attorney was not aware of conflict and former-client witness Sanchez waived privilege, "[t]he mere fact that Grimaldo[']s defense counsel had represented Sanchez does not prove any actual conflict. Grimaldo has not shown that his trial counsel was required to make a choice between advancing Grimaldo's interest or advancing other interests, including Sanchez[']s or his own, to Grimaldo[']s detriment").[10]

---

[10]As expressed in a case out of the Western District of New York,

However, where as here, the former client waives the attorney–client privilege on cross-examination, the risk of a conflict is "significantly diminished," and at worst, results only in a potential conflict of interest. [*United States v.*] *Lussier*, 71 F.3d [456,] 461–62 [(2d Cir. 1995)] (stating that conflict was at worst potential where former client, who was a witness against the defendant, waived his attorney–client privilege as to his prior communications with former counsel); *see also United States v. Thomas*, Nos. 98-1051, 98-1052, 98-1116, 2000 U.S. App. LEXIS 2224, 2000 WL 236481, at *3 (2d Cir. Feb. 14, 2000) (slip [op.]) (finding no actual or potential conflict where defense counsel previously represented at least three government witnesses in unrelated cases and the witnesses had waived their attorney–client privileges with defense counsel for cross-examination purposes); [*United States v.*] *Leslie*, 103 F.3d [1093,] 1098–99 [(2d Cir. 1997)] (finding no actual or potential conflict where defense counsel previously represented client's co-defendant in an unrelated investigation but co-defendant waived attorney–client privilege

Beyond the lack of an actual conflict in this case, the record reflects that no conflict—actual or potential—colored counsel's actions. Contrary to Appellant's assertions, his counsel did cross-examine the ex-wife about her criminal history. Appellant predicates his ineffective-assistance claim on the contention that the conflict impeded his counsel's cross-examination. Because the record shows the contrary, the record rebuts the second prong of an ineffective-assistance claim based on a conflict of interest, i.e., the conflict adversely affected counsel's performance. *See Lopez*, 358 S.W.3d at 694 ("The appellant must show (1) there was an actual conflict of interest[, and] (2) that conflict adversely affected counsel's performance." (citing *Cuyler*, 446 U.S. at 350, 100 S. Ct. at 1719; *Acosta*, 233 S.W.3d at 355)).

In addition to the concern that he expressed about violating the attorney–client privilege, Appellant's trial counsel did say that cross-examining his ex-client put him in the "awkward position of cross-examining and questioning one of my own former

on cross-examination, and stating that if a conflict was assumed, it "could only be regarded as potential"); *cf. United States v. Pizzonia*, 415 F. Supp. 2d 168, 178–79 (E.D.N.Y. 2006) ("Limited representation of a government witness unrelated to representation of the defendant is not likely to present a disabling conflict.") (citing *United States v. Paone*, 782 F.2d 386, 393 (2d Cir. 1986)). By consenting to cross-examination, Moore waived any attorney–client privilege that could have hampered defense counsel's cross-examination. Upon receiving Moore's consent, defense counsel was free to conduct an uninhibited inquiry of Moore[] and indeed did so. Defense counsel appears to have faced no conflict at all upon receiving Moore's consent and, if anything, faced only a potential conflict. *See Lussier*, 71 F.3d at 461–62.

*See Davis v. Smith*, No. 12-CV-0096MAT, 2012 WL 6569372, at *7 (W.D.N.Y. Dec. 17, 2012) (decision & order).

clients." He had previously articulated his additional concern as follows: "If she gets up there, right, and I tear her up on cross and she says something the State doesn't want her to say and they renege on their plea deal, then who is she gonna come after? Me." But once the waiver removed the concrete basis for the conflict, the mere awkwardness of the situation did not create an actual conflict. *See Ramirez*, 13 S.W.3d at 491 (Seerden, C.J., dissenting) ("Therefore, although I acknowledge that counsel is an officer of the court and entitled to respect as such, I do not believe that her conclusory assertions of a conflict and confidential information that might impact in some unspecified manner upon the present cross-examination must be accepted by the court at face value.").

Further, the ex-wife waived the privilege after speaking with her new counsel. Appellant never tells us how a conflict exists from Appellant's counsel's potentially asking the ex-wife hard questions derived from what she had told him during the attorney–client relationship when—after consultation with new counsel—she waived any impediment Appellant's counsel had to use that information. Next, the State placed its plea deal with the ex-wife on the record. Nothing in the offer's terms suggests that Appellant's counsel had a conflict because the offer was contingent on how the ex-wife testified. And as we have noted, Appellant's counsel actually asked the ex-wife hard questions. Thus, if he had felt restrained by a conflict, the cross-examination shows that the waiver removed his reluctance to vigorously cross-examine the ex-wife.

Finally, if there were additional offenses that counsel did not mention during cross-examination, the record does not tell us what those were. Appellant's motion for new trial did not raise a ground that there were additional aspects of his ex-wife's criminal history that his trial counsel was impeded from exploring because of a conflict. As so often happens in the context of an ineffective-assistance claim on direct appeal, even if there were some matter that Appellant's counsel did not raise during cross-examination, we do not have a record telling us what that was, and thus we lack the ability to determine whether the failure to use information during cross-examination adversely affected Appellant. *See Grimaldo*, 2013 WL 3517600, at *5 (stating that appellate court was unable to assess in direct appeal an ineffective-assistance claim based on conflict when "there [was] no evidence regarding any specific privileged information that counsel obtained because of the prior representation that could have given rise to a conflict of interest").

We overrule Appellant's second point.

## IV. Conclusion

Having overruled Appellant's two points, we affirm the trial court's judgments.

Per Curiam

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 1, 2019